Leslie A. KELLY, an individual, dba Les Kelly Publications, dba Les Kelly Enterprises, dba Show me the Gold, Plaintiff–Appellant,

v.

ARRIBA SOFT CORPORATION, An Illinois Corporation, Defendant–Appellee.

No. 00–55521.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 10, 2001.

Filed Feb. 6, 2002.

Charles D. Ossola, Jule L. Sigall, David W. Leary, Jr., Arnold & Porter, Washington, DC, Steven L. Krongold, Arter & Hadden LLP, Washington, DC, for the plaintiff-appellant.

Judith B. Jennison, Perkins Coie LLP, Menlo Park, CA, for the defendant-appellee.

Victor S. Perlman, General Counsel and Managing Director, Philadelphia, PA, for Amici Curiae American Society of Media Photographers, Inc., The Authors Guild, Inc., North American Nature Photography Association, and National Music Publishers' Association.

Robert J. Bernstein, Cowan, Liebowitz & Latman, P.C., New York, NY, for Amici Curiae.

Before: B. FLETCHER, T.G. NELSON, and BERZON, Circuit Judges.

T.G. NELSON, Circuit Judge.

This case involves the application of copyright law to the vast world of the internet and internet search engines. The plaintiff, Leslie Kelly, is a professional

photographer who has copyrighted many of his images of the American West. Some of these images are located on Kelly's web site or other web sites with which Kelly has a license agreement. The defendant, Arriba Soft Corp.,[1] operates an internet search engine that displays its results in the form of small pictures rather than the more usual form of text. Arriba obtained its database of pictures by copying images from other web sites. By clicking on one of these small pictures, called "thumbnails," the user can then view a large version of that same picture within the context of the Arriba web page.

When Kelly discovered that his photographs were part of Arriba's search engine database, he brought a claim against Arriba for copyright infringement. The district court found that Kelly had established a prima facie case of copyright infringement based on Arriba's unauthorized reproduction and display of Kelly's works, but that this reproduction and display constituted a non-infringing "fair use" under Section 107 of the Copyright Act. Kelly appeals that decision, and we affirm in part and reverse in part. The creation and use of the thumbnails in the search engine is a fair use, but the display of the larger image is a violation of Kelly's exclusive right to publicly display his works. We remand with instructions to determine damages and the need for an injunction.

I.

The search engine at issue in this case is unconventional in that it displays the results of a user's query as "thumbnail" images. When a user wants to search the

internet for information on a certain topic, he or she types a search term into a search engine, which then produces a list of web sites that have information relating to the search term. · Normally, the list of results is in text format. The Arriba search engine, however, produces its list of results as small pictures.

To provide this functionality, Arriba developed a computer program that "crawls" the web looking for images to index. This crawler downloads full-sized copies of the images onto ·Arriba's server. The program then uses these copies to generate smaller, lower-resolution thumbnails of the images. Once the thumbnails are created, the program deletes the full-sized originals from the server. Although a user could copy these thumbnails to his computer or disk, he cannot increase the resolution of the thumbnail; any enlargement would result in a loss of clarity of the image.

The second component of the Arriba program occurs when the user double-clicks on the thumbnail. From January 1999 to June 1999, clicking on the thumbnail produced the "Images Attributes" page. This page contained the original full-sized image imported directly from the originating web site, along with text describing the size of the image, a link to the originating web site, the Arriba banner, and Arriba advertising. The process of importing an image from another web site is called inline linking. The image imported from another web site is displayed as though it is part of the current web page, surrounded by the current web page's text and advertising. As a result, although the image in Arriba's Image Attributes page was directly from the originating web site,

**1.** Arriba Soft has changed its name since the start of this litigation. It is now known as "Ditto.com."

and not copied onto Arriba's site, the user typically would not realize that the image actually resided on another web site.

From July 1999 until sometime after August 2000, the results page contained thumbnails accompanied by two links: "Source" and "Details." The "Details" link produced a screen similar to the Images Attributes page but with a thumbnail rather than the full-sized image. Alternatively, by clicking on the "Source" link or the thumbnail from the results page, the site produced two new windows on top of the Arriba page. The window in the forefront contained the full-sized image, imported directly from the originating web site. Underneath that was another window displaying the originating web page. This technique is known as framing. The image from a second web site is viewed within a frame that is pulled into the primary site's web page.[2]

In January 1999, Arriba's crawler visited web sites that contained Kelly's photographs. The crawler copied thirty-five of Kelly's images to the Arriba database. Kelly had never given permission to Arriba to copy his images and objected when he found out that Arriba was using them. Arriba deleted the thumbnails of images that came from Kelly's own web sites and placed those sites on a list of sites that it would not crawl in the future. Several months later, Arriba received Kelly's complaint of copyright infringement, which identified other images of his that came from third-party web sites. Arriba subsequently deleted those thumbnails and placed those third-party sites on a list of sites that it would not crawl in the future.

The district court granted summary judgment in favor of Arriba. Although the court found that Kelly had established a prima facie case of infringement based on Arriba's reproduction and display of Kelly's photographs, the court ruled that such actions by Arriba constituted fair use. The court determined that two of the fair use factors weighed heavily in Arriba's favor. Specifically, the court found that the character and purpose of Arriba's use was significantly transformative and the use did not harm the market for or value of Kelly's works. Kelly now appeals this decision.

## II.

■ We review a grant of summary judgment de novo.[3] We also review the court's finding of fair use, which is a mixed question of law and fact, by this same standard.[4] "In doing so, we must balance the nonexclusive factors set out in 17 U.S.C. § 107."[5]

This case involves two distinct actions by Arriba that warrant analysis. The first action consists of the reproduction of Kelly's images to create the thumbnails and the use of those thumbnails in Arriba's search engine. The second action involves the display of Kelly's images through the inline linking and framing processes when the user clicks on the thumbnails. Because these actions are distinct types of potential infringement, we will analyze them separately.

---

**2.** Currently, when a user clicks on the thumbnail, a window of the home page of the image appears on top of the Arriba page. There is no window with just the image.

**3.** *Los Angeles News Serv. v. Reuters Television Int'l. Ltd.*, 149 F.3d 987, 993 (9th Cir.1998).

**4.** *Id.*

**5.** *Id.*

## A.

An owner of a copyright has the exclusive right to reproduce, distribute, and publicly display copies of the work.[6] To establish a claim of copyright infringement by reproduction, the plaintiff must show ownership of the copyright and copying by the defendant.[7] As to the thumbnails, there is no dispute that Kelly owned the copyright to the images and that Arriba copied those images. Therefore, Kelly established a prima facie case of copyright infringement.

A claim of copyright infringement is subject to certain statutory exceptions, including the fair use exception.[8] This exception "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster."[9] The statute sets out four factors to consider in determining whether the use in a particular case is a fair use.[10] We must balance these factors, in light of the objectives of copyright law, rather than view them as definitive or determinative tests.[11] We now turn to the four fair use factors.

### 1. Purpose and character of the use.

The Supreme Court has rejected the proposition that a commercial use of the copyrighted material ends the inquiry under this factor.[12] Instead,

> [t]he central purpose of this investigation is to see ... whether the new work merely supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is transformative.[13]

The more transformative the new work, the less important the other factors, including commercialism, become.[14]

There is no dispute that Arriba operates its web site for commercial purposes and that Kelly's images were part of Arriba's search engine database. As the district court found, while such use of Kelly's images was commercial, it was more incidental and less exploitative in nature than more traditional types of commercial use.[15] Arriba was neither using Kelly's images to directly promote its web site nor

---

6. 17 U.S.C. § 106.

7. *Hustler Magazine, Inc. v. Moral Majority, Inc.*, 796 F.2d 1148, 1151 (9th Cir.1986) (quoting 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.01 (1985)).

8. 17 U.S.C. §§ 106, 107.

9. *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1399 (9th Cir.1997) (internal quotation marks and citation omitted).

10. The four factors are: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107.

11. *Dr. Seuss*, 109 F.3d at 1399.

12. *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 579, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994).

13. *Id.* (internal quotation marks and citation omitted) (alteration in original).

14. *Id.*

15. *See, e.g., A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1015 (9th Cir.2001) ("[C]ommercial use is demonstrated by a showing that repeated and exploitative unauthorized copies of copyrighted works were made to save the expense of purchasing authorized copies.").

trying to profit by selling Kelly's images. Instead, Kelly's images were among thousands of images in Arriba's search engine database. Because the use of Kelly's images was not highly exploitative, the commercial nature of the use only slightly weighs against a finding of fair use.

The second part of the inquiry as to this factor involves the transformative nature of the use. We must determine if Arriba's use of the images merely superseded the object of the originals or instead added a further purpose or different character.[16] We find that Arriba's use of Kelly's images for its thumbnails was transformative.

Despite the fact that Arriba made exact replications of Kelly's images, the thumbnails were much smaller, lower-resolution images that served an entirely different function than Kelly's original images. Kelly's images are artistic works used for illustrative purposes. His images are used to portray scenes from the American West in an esthetic manner. Arriba's use of Kelly's images in the thumbnails is unrelated to any esthetic purpose. Arriba's search engine functions as a tool to help index and improve access to images on the internet and their related web sites. In fact, users are unlikely to enlarge the thumbnails and use them for artistic purposes because the thumbnails are of much lower resolution than the originals; any enlargement results in a significant loss of clarity of the image, making them inappropriate as display material.

Kelly asserts that because Arriba reproduced his exact images and added nothing to them, Arriba's use cannot be transformative. It is true that courts have been reluctant to find fair use when an original work is merely retransmitted in a different medium.[17] Those cases are inapposite, however, because the resulting use of the copyrighted work in those cases was the same as the original use. For instance, reproducting music CD's into computer MP3 format does not change the fact that both formats are used for entertainment purposes. Likewise, reproducing news footage into a different format does not change the ultimate purpose of informing the public about current affairs.

Even in *Infinity Broadcast Corp. v. Kirkwood*,[18] where the retransmission of radio broadcasts over telephone lines was for the purpose of allowing advertisers and radio stations to check on the broadcast of commercials or on-air talent, there was nothing preventing listeners from subscribing to the service for entertainment purposes. Even though the intended purpose of the retransmission may have been different from the purpose of the original transmission, the result was that people could use both types of transmissions for the same purpose.

This case involves more than merely a retransmission of Kelly's images in a different medium. Arriba's use of the images serves a different function than Kelly's use-improving access to information on the internet versus artistic expression. Furthermore, it would be unlikely that anyone would use Arriba's thumbnails for illustrative or esthetic purposes because enlarging them sacrifices their clarity. Be-

---

**16.** *Campbell,* 510 U.S. at 579, 114 S.Ct. 1164.

**17.** *See Infinity Broad. Corp. v. Kirkwood,* 150 F.3d 104, 108 (2d Cir.1998) (concluding that retransmission of radio broadcast over telephone lines is not transformative); *UMG Recordings, Inc. v. MP3.Com, Inc.,* 92 F.Supp.2d 349, 351 (S.D.N.Y.2000) (finding that repro-

duction of audio CD into computer MP3 format does not transform the work); *Los Angeles News Serv.,* 149 F.3d at 993 (finding that reproducing news footage without editing the footage was not very transformative).

**18.** 150 F.3d 104.

cause Arriba's use is not superseding Kelly's use but, rather, has created a different purpose for the images, Arriba's use is transformative.

Comparing this case to two recent cases in the Ninth and First Circuits reemphasizes the functionality distinction. In *Worldwide Church of God v. Philadelphia Church of God,*[19] we held that copying a religious book to create a new book for use by a different church was not transformative.[20] The second church's use of the book merely superseded the object of the original book, which was to serve religious practice and education. The court noted that "where the use is for the same intrinsic purpose as [the copyright holder's] ... such use seriously weakens a claimed fair use."[21]

On the other hand, in *Nunez v. Caribbean International News Corp.,*[22] the First Circuit found that copying a photograph that was intended to be used in a modeling portfolio and using it instead in a news article was a transformative use.[23] By putting a copy of the photograph in the newspaper, the work was transformed into news, creating a new meaning or purpose for the work. The use of Kelly's images in Arriba's search engine is more analogous to the situation in *Nunez* because Arriba has created a new purpose for the images and is not simply superseding Kelly's purpose.

The Copyright Act was intended to promote creativity, thereby benefitting the artist and the public alike. To preserve the potential future use of artistic works for purposes of teaching, research, criticism, and news reporting, Congress made the fair use exception.[24] Arriba's use of Kelly's images promotes the goals of the Copyright Act and the fair use exception. The thumbnails do not stifle artistic creativity because they are not used for illustrative or artistic purposes and therefore do not supplant the need for the originals. In addition, they benefit the public by enhancing information gathering techniques on the internet.

In *Sony Computer Entertainment America, Inc. v. Bleem,*[25] we held that when Bleem copied "screen shots" from Sony computer games and used them in its own advertising, it was a fair use.[26] In finding that the first factor weighed in favor of Bleem, we noted that "comparative advertising redounds greatly to the purchasing public's benefit with very little corresponding loss to the integrity of Sony's copyrighted material."[27] Similarly, this first factor weighs in favor of Arriba due to the public benefit of the search engine and the minimal loss of integrity to Kelly's images.

2. *Nature of the copyrighted work.*

"Works that are creative in nature are closer to the core of intended

---

**19.** 227 F.3d 1110 (9th Cir.2000).

**20.** *Id.* at 1117.

**21.** *Id.* (internal quotation and citation omitted) (alteration and ellipses in original).

**22.** 235 F.3d 18 (1st Cir.2000).

**23.** *Id.* at 22–23.

**24.** 17 U.S.C. § 107 ("[T]he fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright."); *See also Campbell,* 510 U.S. at 577, 114 S.Ct. 1164.

**25.** 214 F.3d 1022 (9th Cir.2000).

**26.** *Id.* at 1029.

**27.** *Id.* at 1027.

copyright protection than are more fact-based works." [28] Photographs used for illustrative purposes, such as Kelly's, are generally creative in nature. The fact that a work is published or unpublished also is a critical element of its nature.[29] Published works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred.[30] Kelly's images appeared on the internet before Arriba used them in its search image. When considering both of these elements, we find that this factor only slightly weighs in favor of Kelly.

### 3. Amount and substantiality of portion used.

"While wholesale copying does not preclude fair use per se, copying an entire work militates against a finding of fair use." [31] However, the extent of permissible copying varies with the purpose and character of the use.[32] If the secondary user only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her.

This factor will neither weigh for nor against either party because, although Arriba did copy each of Kelly's images as a whole, it was reasonable to do so in light of Arriba's use of the images. It was neces-sary for Arriba to copy the entire image to allow users to recognize the image and decide whether to pursue more information about the image or the originating web site. If Arriba only copied part of the image, it would be more difficult to identify it, thereby reducing the usefulness of the visual search engine.

### 4. Effect of the use upon the potential market for or value of the copyrighted work.

This last factor requires courts to consider "not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market for the original.' "[33] A transformative work is less likely to have an adverse impact on the market of the original than a work that merely supersedes the copyrighted work.[34]

Kelly's images are related to several potential markets. One purpose of the photographs is to attract internet users to his web site, where he sells advertising space as well as books and travel packages. In addition, Kelly could sell or license his photographs to other web sites

**28.** A & M Records, 239 F.3d at 1016 (citing Campbell, 510 U.S. at 586, 114 S.Ct. 1164) (internal quotation marks omitted).

**29.** Harper & Row, Publishers, Inc. v. Nation Enters., 471 U.S. 539, 564, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985) (noting that the scope of fair use is narrower with respect to unpublished works because the author's right to control the first public appearance of his work weighs against the use of his work before its release).

**30.** Id.

**31.** Worldwide Church of God, 227 F.3d at 1118 (internal quotation marks and citation omitted).

**32.** Campbell, 510 U.S. at 586–87, 114 S.Ct. 1164.

**33.** Id. at 590, 114 S.Ct. 1164 (quoting 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 13.05[A][4], at 13–102.61 (1993)) (ellipses in original).

**34.** See id. at 591, 114 S.Ct. 1164 (stating that a work that supersedes the object of the original serves as a market replacement for it, making it likely that market harm will occur, but when the second use is transformative, market substitution is less certain).

or to a stock photo database, which then could offer the images to its customers.

Arriba's use of Kelly's images in its thumbnails does not harm the market for Kelly's images or the value of his images. By showing the thumbnails on its results page when users entered terms related to Kelly's images, the search engine would guide users to Kelly's web site rather than away from it. Even if users were more interested in the image itself rather than the information on the web page, they would still have to go to Kelly's site to see the full-sized image. The thumbnails would not be a substitute for the full-sized images because when the thumbnails are enlarged, they lose their clarity. If a user wanted to view or download a quality image, he or she would have to visit Kelly's web site.[35] This would hold true whether the thumbnails are solely in Arriba's database or are more widespread and found in other search engine databases.

Arriba's use of Kelly's images also would not harm Kelly's ability to sell or license his full-sized images. Arriba does not sell or license its thumbnails to other parties. Anyone who downloaded the thumbnails would not be successful selling the full-sized images because of the low-resolution of the thumbnails. There would be no way to view, create, or sell a clear, full-sized image without going to Kelly's web sites. Therefore, Arriba's creation and use of the thumbnails does not harm the market for or value of Kelly's images. This factor weighs in favor of Arriba.

Having considered the four fair use factors and found that two weigh in favor of Arriba, one is neutral, and one weighs slightly in favor of Kelly, we conclude that Arriba's use of Kelly's images as thumbnails in its search engine is a fair use.

### B.

The second part of our analysis concerns Arriba's inline linking to and framing of Kelly's full-sized images. This use of Kelly's images does not entail copying them but, rather, importing them directly from Kelly's web site. Therefore, it cannot be copyright infringement based on the reproduction of copyrighted works as in the previous discussion. Instead, this use of Kelly's images infringes upon Kelly's exclusive right to "display the copyrighted work publicly."[36]

#### 1. *Public display right.*

In order for Kelly to prevail, Arriba must have displayed Kelly's work without his permission and made that display available to the public. The Copyright Act defines "display" as showing a copy of a work.[37] This would seem to preclude Kelly from arguing that showing his original images was an infringement. However, the Act defines a copy as a material object in which a work is fixed, including the material object in which the work is first fixed.[38] The legislative history of the Act makes clear that "[s]ince 'copies' are de-

---

**35.** We do not suggest that the inferior display quality of a reproduction is in any way dispositive, or will always assist an alleged infringer in demonstrating fair use. In this case, however, it is extremely unlikely that users would download thumbnails for display purposes, as the quality full-size versions are easily accessible from Kelly's web sites.

In addition, we note that in the unique context of photographic images, the quality of the reproduction may matter more than in other fields of creative endeavor. The appearance of photographic images accounts for virtually their entire esthetic value.

**36.** 17 U.S.C. § 106(5).

**37.** *Id.* § 101.

**38.** *Id.*

fined as including the material object 'in which the work is first fixed,' the right of public display applies to original works of art as well as to reproductions of them." [39] By inline linking and framing Kelly's images, Arriba is showing Kelly's original works without his permission.

The legislative history goes on to state that " 'display' would include the projection of an image on a screen or other surface by any method, the transmission of an image by electronic or other means, and the showing of an image on a cathode ray tube, or similar viewing apparatus connected with any sort of information storage and retrieval system." [40] This language indicates that showing Kelly's images on a computer screen would constitute a display.

The Act's definition of the term "publicly" encompasses a transmission of a display of a work to the public "by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." [41] A display is public even if there is no proof that any of the potential recipients was operating his receiving apparatus at the time of the transmission. [42] By making Kelly's images available on its web site, Arriba is allowing public access to those images. The ability to view those images is unrestricted to anyone with a computer and internet access.

The legislative history emphasizes the broad nature of the display right, stating that "[e]ach and every method by which the images or sounds comprising a performance or display are picked up and conveyed is a 'transmission,' and if the transmission reaches the public in [any] form, the case comes within the scope of [the public performance and display rights] of section 106." [43] Looking strictly at the language of the Act and its legislative history, it appears that when Arriba imports Kelly's images into its own web page, Arriba is infringing upon Kelly's public display right. The limited case law in this area supports this conclusion.

No cases have addressed the issue of whether inline linking or framing violates a copyright owner's public display rights. However, in *Playboy Enterprises, Inc. v. Webbworld, Inc.,* [44] the court found that the owner of an internet site infringed a magazine publisher's copyrights by displaying copyrighted images on its web site. [45] The defendant, Webbworld, downloaded material from certain newsgroups, discarded the text and retained the images, and made those images available to its internet subscribers. [46] Playboy owned copyrights to many of the images Webbworld retained and displayed. The court found that Webbworld violated Playboy's exclusive right to display its copyrighted works, not-

---

39. H.R.Rep. No. 94–1476, at 64 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5677.

40. *Id.*

41. 17 U.S.C. § 101.

42. H.R.Rep. No. 94–1476, at 64–65 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5678.

43. *Id.* at 64, *reprinted in* 1976 U.S.C.C.A.N. at 5678.

44. 991 F.Supp. 543 (N.D.Texas 1997).

45. *Id.* at 552–53.

46. *Id.* at 549–50. Interestingly, the images were retained as both full-sized images and thumbnails. A subscriber could view several thumbnails on one page and then view a full-sized image by clicking on the thumbnail. However, both the thumbnail and full-sized image were copied onto Webbworld's server so no inline linking or framing was used.

ing that allowing subscribers to view copyrighted works on their computer monitors while online was a display.[47] The court also discounted the fact that no image existed until the subscriber downloaded it. The image existed in digital form, which made it available for decoding as an image file by the subscriber, who could view the images merely by visiting the Webbworld site.[48]

Although Arriba does not download Kelly's images to its own server but, rather, imports them directly from other web sites, the situation is analogous to *Webbworld*. By allowing the public to view Kelly's copyrighted works while visiting Arriba's web site, Arriba created a public display of Kelly's works. Arriba argues that Kelly offered no proof that anyone ever saw his images and, therefore, there can be no display. We dispose of this argument, as did the court in *Webbworld*, because Arriba made the images available to any viewer that merely visited Arriba's site. Allowing this capability is enough to establish an infringement; the fact that no one saw the images goes to the issue of damages, not liability.

In a similar case, *Playboy Enterprises, Inc. v. Russ Hardenburgh, Inc.*,[49] the court

held that the owner of an electronic bulletin board system infringed Playboy's copyrights by displaying copyrighted images on its system.[50] The bulletin board is a central system that stores information, giving home computer users the opportunity to submit information to the system (upload) or retrieve information from the system (download). In this case, the defendant encouraged its subscribers to upload adult photographs, screened all submitted images, and moved some of the images into files from which general subscribers could download them.[51] Because these actions resulted in subscribers being able to download copyrighted images, it violated Playboy's right of public display.[52] Again, the court noted that adopting a policy that allowed the defendants to place images in files available to subscribers entailed a display.[53] This conclusion indicates that it was irrelevant whether anyone actually saw the images.

Both of these cases highlighted the fact that the defendants took an active role in creating the display of the copyrighted images. The reason for this emphasis is that several other cases held that operators of bulletin board systems and internet access providers were not liable for copyright infringement.[54] These cases distin-

---

47. *Id.* at 552.

48. *Id.*

49. 982 F.Supp. 503 (N.D.Ohio 1997).

50. *Id.* at 513.

51. *Id.*

52. *Id.*

53. *Id.*

54. *See e.g. Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.*, 907 F.Supp. 1361, 1372–73 (N.D.Cal.1995) (holding that operator of a computer bulletin board system that forwarded messages from subscribers to other subscribers was not liable for displaying

copyrighted works because it took no role in controlling the content of the information but only acted as passive conduit of the information); *Marobie–Fl, Inc. v. Nat'l. Ass'n of Fire and Equip. Distribs.*, 983 F.Supp. 1167, 1176–79 (N.D.Ill.1997) (holding that company that provided a host computer for web page and access link to internet users was not directly liable for copyright infringement when administrator of web page posted copyrighted works on the page, because it only provided the means to display the works but did not engage in the activity itself); *Costar Group Inc. v. Loopnet, Inc.*, 164 F.Supp.2d 688, 695–96 (D.Md.2001) (holding that operator of a web site that hosted real estate listings and photos was not directly liable for copyright infringement because it did not actively participate in copying or displaying the images).

guished direct infringement from contributory infringement and held that where the defendants did not take any affirmative action that resulted in copying copyrighted works, but only maintained a system that acted as a passive conduit for third parties' copies, they were not liable for direct infringement.

The courts in *Webbworld* and *Hardenburgh* specifically noted that the defendants did more than act as mere providers of access or passive conduits.[55] In *Webbworld*, the web site sold images after actively trolling the internet for them and deciding which images to provide to subscribers. The court stated that "Webbworld exercised total dominion over the content of its site and the product it offered its clientele."[56] Likewise, in *Hardenburgh*, the court found that by encouraging subscribers to upload images and then screening those images and selecting ones to make available for downloading, the defendants were more than passive conduits.[57]

Like the defendants in *Webbworld* and *Hardenburgh*, Arriba is directly liable for infringement. Arriba actively participated in displaying Kelly's images by trolling the web, finding Kelly's images, and then having its program inline link and frame those images within its own web site. Without this program, users would not have been able to view Kelly's images within the context of Arriba's site. Arriba acted as more than a passive conduit of the images by establishing a direct link to the copyrighted images. Therefore, Arriba is liable for publicly displaying Kelly's copyrighted images without his permission.

### 2. *Fair use of full-sized images.*

 The last issue we must address is whether Arriba's display of Kelly's full-sized images was a fair use. Although Arriba did not address the use of the full-sized images in its fair use argument, the district court considered such use in its analysis, and we will consider Arriba's fair use defense here.

Once again, to decide whom the first factor, the purpose and character of the use, favors, we must determine whether Arriba's use of Kelly's images was transformative.[58] Unlike the use of the images for the thumbnails, displaying Kelly's full-sized images does not enhance Arriba's search engine. The images do not act as a means to access other information on the internet but, rather, are likely the end product themselves. Although users of the search engine could link from the full-sized image to Kelly's web site, any user who is solely searching for images would not need to do so. Because the full-sized images on Arriba's site act primarily as illustrations or artistic expression and the search engine would function the same without them, they do not have a purpose different from Kelly's use of them.

Not only is the purpose the same, but Arriba did not add new expression to the images to make them transformative.[59] Placing the images in a "frame" or locating them near text that specifies the size and originating web site is not enough to create new expression or meaning for the images. In sum, Arriba's full-sized images superseded the object of Kelly's images.[60]

---

55. *Webbworld,* 991 F.Supp. at 552; *Hardenburgh,* 982 F.Supp. at 513.

56. *Webbworld,* 991 F.Supp. at 552.

57. *Hardenburgh,* 982 F.Supp. at 513.

58. *See Campbell,* 510 U.S. at 579, 114 S.Ct. 1164.

59. *Id.*

60. *Id.*

Because Arriba has not changed the purpose or character of the use of the images, the first factor favors Kelly.

The analysis of the second factor, the nature of the copyrighted work, is the same as in the previous fair use discussion because Kelly's images are still the copyrighted images at issue. Therefore, as before, this factor slightly weighs in favor of Kelly.

The third fair use factor turns on the amount of the work displayed and the reasonableness of this amount in light of the purpose for the display.[61] Arriba displayed the full images, which cuts against a finding of fair use. And while it was necessary to provide whole images to suit Arriba's purpose of giving users access to the full-sized images without having to go to another site, such a purpose is not legitimate, as we noted above. Therefore, it was not reasonable to copy the full-sized display. The third factor favors Kelly.

The fourth factor often depends upon how transformative the new use is compared to the original use. A work that is very transformative will often be in a different market from the original work and therefore is less likely to cause harm to the original work's market.[62] Works that are not transformative, however, have the same purpose as the original work and will often have a negative effect on the original work's market.[63]

As discussed in the previous fair use analysis, Kelly's markets for his images include using them to attract advertisers and buyers to his web site, and selling or licensing the images to other web sites or stock photo databases. By giving users access to Kelly's full-sized images on its own web site, Arriba harms all of Kelly's markets. Users will no longer have to go to Kelly's web site to see the full-sized images, thereby deterring people from visiting his web site. In addition, users would be able to download the full-sized images from Arriba's site and then sell or license those images themselves, reducing Kelly's opportunity to sell or license his own images. If the display of Kelly's images became widespread across other web sites, it would reduce the number of visitors to Kelly's web site even further and increase the chance of others exploiting his images. These actions would result in substantial adverse effects to the potential markets for Kelly's original works. For this reason, the fourth factor weighs heavily in favor of Kelly.

In conclusion, all of the fair use factors weigh in favor of Kelly. Therefore, the doctrine of fair use does not sanction Arriba's display of Kelly's images through the inline linking or framing processes that puts Kelly's original images within the context of Arriba's web site.

## CONCLUSION

We hold that Arriba's reproduction of Kelly's images for use as thumbnails in Arriba's search engine is a fair use under the Copyright Act. We also hold that Arriba's display of Kelly's full-sized images is not a fair use and thus violates Kelly's exclusive right to publicly display his copyrighted works. The district court's opinion is affirmed as to the thumbnails and reversed as to the display of the full-sized images. We remand with instructions to determine damages for the copyright infringement and the necessity for an injunction. Each party shall bear its own costs and fees on appeal.

---

**61.** *Id.* at 586–87, 114 S.Ct. 1164.

**62.** *Id.* at 591, 114 S.Ct. 1164.

**63.** *Id.*

AFFIRMED in part, REVERSED in part, and REMANDED.