VIDEO PIPELINE, INC., Plaintiff,

v.

BUENA VISTA HOME
ENTERTAINMENT,
INC., Defendant.

Buena Vista Home Entertainment,
Inc. and Miramax Film Corp.,
Counterclaim–Plaintiffs,

v.

Video Pipeline, Inc., Counterclaim–
Defendant.

Civil No. 00–5236(JBS).

United States District Court,
D. New Jersey.

Aug. 7, 2003.

Gary D. Fry, Esquire, Paul R. Fitzmaurice, Esquire, Lisa A. Sabatino, Esquire, Pelino & Lentz, P.C., Philadelphia, PA, for Plaintiff and Counterclaim–Defendant Video Pipeline.

Gary A. Rosen, Esquire, Patrick Madamba, Esquire, Akin, Gump, Strauss, Hauer & Feld, LLP, Philadelphia, PA, for Defendant and Counterclaim–Plaintiff Buena Vista Home Entertainment, Inc. and Counterclaim–Plaintiff Miramax Film Corp.

### *OPINION*

SIMANDLE, District Judge.

### *TABLE OF CONTENTS*

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .547

II. DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .553
 A. Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .553
 B. Defendant's Copyright Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .554
 1. Copyright Infringement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .554
 2. Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .555
 3. Registration of Copyright . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .555
 4. Copyright Misuse Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .557
 5. Implied License . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .558
 6. Database as Derivative Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .559
 C. Plaintiff's Declaratory Judgment Claims . . . . . . . . . . . . . . . . . . . . . . . . . . .559
 1. Copyright Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .559
 2. Fair Use Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .560
 a. Purpose and Character of Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .561
 b. Nature of the Copyrighted Work . . . . . . . . . . . . . . . . . . . . . . . . . . . .563
 c. Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .563
 d. Effect of the Use Upon the Potential Market for or Value of the Copyrighted Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .565
 e. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .566
 D. Finding of Copyright Infringement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .566
 E. Breach of Contract Counterclaim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .566
 F. Trademark Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .569
 1. Damages Under § 1125(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .574
 2. State Unfair Competition Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .575
 G. State Claims for Conversion and Replevin . . . . . . . . . . . . . . . . . . . . . . . . . .576

III. CONCLUSION .................................................576

This case arises out of plaintiff Video Pipeline's use of defendant Buena Vista Home Entertainment's motion picture trailers on the internet, and plaintiff's creation of its own clip previews from defendant's movies, which it streamed to interested customers online. This matter comes before the Court upon plaintiff Video Pipeline's motion for summary judgment on its two counts seeking a declaratory judgment that its actions do not constitute copyright infringement, and on defendant/counterclaim-plaintiff's amended counterclaims. Defendant/counterclaim-plaintiff Buena Vista Home Entertainment also moves for summary judgment on its amended counterclaims brought under the Lanham Act and state law, and partial summary judgment on its federal copyright infringement counterclaim, only with respect to plaintiff's conduct post-December 2000.

For the reasons stated below, plaintiff's motion for summary judgment on its declaratory judgment action will be denied, and its motion for summary judgment on defendant's amended counterclaims will also be denied. Defendant's motion for summary judgment on its amended counterclaims will be granted, and plaintiff will be ordered to return all in-store trailers it received from defendant during 1993 to 2000.

## I. BACKGROUND

Plaintiff Video Pipeline compiles and organizes movie studios' promotional previews ("trailers"), which are used to promote the sales and rentals of home videos. (Pl.'s Answer to Interrogatory, Pl.'s Ex. C,

at No. 4; Disney's Responses to Requests for Admission, Pl.'s Ex. D, at Nos. 2, 4.) Defendant Buena Vista Home Entertainment ("BVHE") is a wholly-owned subsidiary of The Walt Disney Company ("TWDC"), and produces, distributes, and sells home video versions of Disney's copyrighted motion pictures and other entertainment content, including content under the "Buena Vista" name. (McQueen Cert., Def.'s App. Ex. D, ¶¶ 1–2.) TWDC, through another indirect, wholly-owned subsidiary Walt Disney Pictures and Television ("WDPT"), produces and acquires copyrighted motion pictures and other entertainment content under the "Touchstone Pictures," "Hollywood Pictures," "Walt Disney Pictures," and "Walt Disney Television" labels. (BVHE Vice President for Business and Legal Affairs Kristin McQueen Cert., Defs.' App. Ex. D, ¶¶ 1, 2.) Through another indirect, wholly-owned subsidiary Miramax, TWDC produces and acquires copyrighted motion pictures that are distributed under the names "Miramax Films" and "Dimension Films." (McQueen Cert. Defs.' App. Ex. D, ¶ 3.) BVHE is the exclusive licensee of WDPT in the home video market, and is the exclusive domestic distributor for Miramax in the home video market.[1] (McQueen Cert., Def.'s App. Ex. D, ¶¶ 2, 3.) ("Disney" hereinafter refers to The Walt Disney Company and its various subsidiaries, including BVHE and Miramax.)

Since 1985, plaintiff has been in the business of aggregating trailers and other promotional material obtained from entertainment companies, including Universal, Warner Bros., Twentieth Century Fox,

---

**1.** On March 28, 2002, this Court previously granted defendant's motion for preliminary injunction with respect to plaintiff's creation and online streaming of "clip previews," which it created by using material from de-

fendant's copyrighted motion pictures. *See Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.,* 192 F.Supp.2d 321 (D.N.J. 2002).

and BVHE and Miramax, into preview programs in videotape format to promote the sales and rentals of their home video products. (Horovitz Aff., Pl.'s App. Ex. E, ¶ 5.) Since 1985, plaintiff has had agreements with more than 2,000 home video wholesalers and retailers to provide them with compiled promotional previews to be shown by the retailers instore, at the point-of-sale. (*Id.* ¶ 8.) During the first few years, plaintiff had to edit the material it was sent because it contained sales and marketing information not intended for home video customers, and because the content may have been inappropriate for the particular store or neighborhood. (*Id.* ¶ 6.) In other cases, plaintiff had to combine clips to create previews when it was sent clips or just copies of the entire movie. (*Id.*) Since 1985, plaintiff has organized trailers from different studios and provided more than 1.1 million trailers on videotape to over 2,000 home video distributors and retailers promoting home video sales and rentals. (Horovitz Aff., Pl.'s App. Ex. E, ¶¶ 8–9; Pl.'s Answer to Interrogatory, Pl.'s Ex. C, at No. 4.)

In 1988, plaintiff entered into a contract with BVHE, called the "Master Clip License Agreement," in which BVHE granted plaintiff permission to use certain trailers as part of plaintiff's videotape preview compilations, displayed in stores to promote home video rentals or sales. (Disney's Answer, ¶ 7; Master Clip License Agreement, Pl.'s App. Ex. I; Defs.' App. Ex. K, Tab 50.) The Master Clip License Agreement provided for BVHE to provide plaintiff, the licensee, with trailers to be shown in a manner designated by Disney "from time to time":

> This letter constitutes an agreement between Buena Vista Home Video ("Disney") and Video Pipeline, Inc. ("Licensee") in connection with Disney's grant to Licensee of permission to use certain three-quarter inch (3/4″) broadcast quality videotape masters of certain clips as

shall be designated by Disney from time to time (the "Videos") in connection with the preview tapes to be created for such uses as Disney shall designate from time to time (the "Programs"), upon the terms and conditions set forth herein: Subject to the terms and conditions provided herein, Disney hereby delivers the Videos to Licensee and grants to Licensee the non-exclusive right to exhibit the Videos (i.e., the clips contained on the above referenced masters) on the Programs and for no other purpose. Licensee is expressly prohibited from selling the Videos to any third party or from exhibiting it in any manner other than as provided herein.

> The term of this Agreement will commence as of the date hereof and end upon the Licensee's completion of the Programs.

> Licensee is expressly prohibited from editing, modifying or otherwise altering the Videos; provided, however, the Licensee may exhibit the Videos in its entirety or in excerpts thereof.

> . . .

> Licensee will return the videos to Disney, at Licensee's sole expense, immediately upon Disney's request therefor.

(Master Clip License Agreement, Pl.'s App. Ex. I; Defs.' App. Ex. K, Tab 50.) From 1988 to 1993, plaintiff would typically send a form request letter to BVHE for trailers for specific home releases to be incorporated into a particular videotape compilation for in-store exhibition, and BVHE would respond by sending the requested trailers and a confirmation letter indicating its authorization to plaintiff to use the three–quarter inch broadcast quality videotape masters of trailers of certain motion pictures. (Video Pipeline Distribution/Production Manager Anne Green Dep. Tr., Defs.' App. Ex. H, at 38–40; BVHE Designation Letters, Pl.'s App. Ex. J.) The

parties agreed that the trailers would be used in store locations, for example, as confirmed by a letter from Richard Lesse:

> This letter confirms our approval for usage of the following trailers for your special *in-store* preview program featuring the winners of this year's Homer Awards.

(R. Lesse Designation Letter, Pl.'s App. Ex. J, at VP707 (emphasis added),) and a letter by BVHE Credits and Contract Administrator Joan Spiga:

> These trailers are provided to Licensee by Disney in connection with a preview tape program for SUNCOAST, pursuant to the terms and conditions set forth in that certain Master Clip Agreement entered into between Disney and Licensee dated as of November 7, 1988.

(Designation Letter by Spiga, Pl.'s App. Ex. J, at VP702.)

Apparently because BVHE was backed up on paperwork regarding the trailer provisions, BVHE no longer provided plaintiff with these designation letters after February 1993. (McQueen Dep. Tr., Pl.'s App. Ex. L, at 33–34.) Plaintiff nevertheless continued its practice of requesting trailers from BVHE by letter, which were to be reviewed by BVHE's legal department. (Green Letter, 3/23/94, Defs.' App. Ex. K, Tab 52; Horovitz Dep. Tr., Defs.' App. Ex. F, at 33–34; McQueen Dep. Tr., Pl.'s App. Ex. L, at 33.) BVHE would often send plaintiff the entire sales–force reel because it was easier than getting the specific trailers requested. (Green Dep. Tr. 2/6/02, Pl.'s Supp.App. Ex. S, at 40.)

Beginning in approximately 1995, home video retailers began using the internet as a means of marketing home video products. (Horovitz Aff., Pl.'s App. Ex. E, ¶ 5.) Trailers have become more than advertising material for other products; they have become valuable entertainment content in their own right, as web surfers continually frequent the internet to view these online commodities prior to movie releases, (Article, 3/22/02, Defs.' App. Ex. M), and such previews increase web site traffic and online "stickiness," which give web site owners additional time and opportunities to market their services and products. (Darner Email, 5/16/00, Defs.' App. Ex. L.) As stated by netflix.com, "With us, as with many websites, our objectives reach beyond simple 'sales.' In addition to renting movies, we are always interested in increasing site traffic and site 'stickiness.'" (*Id.*) Due to site "stickiness," advertisements by the web site owner and third parties that are shown simultaneously provide multiple opportunities for internet customers to buy other products at the click of a button. (Disney Advertisements, Defs.' App. Exs. N, O, P, Q.)

In 1997, plaintiff notified various entertainment companies, including Miramax and BVHE, that it was beginning the process of making the trailers available to home video retailers' web sites by means of an internet service called "VideoPipeline.net." (Horovitz Aff., Pl.'s App. Ex. E, ¶ 17.) In or around 1998, plaintiff created an online database, located at VideoDetective.com, which organized information and still photographs from the various previews to promote home video sales and rentals on the internet. (Robert Kolo Dep. Tr., Defs.' Ex. J, at 24.) The content of this VideoDetective.com web site changed to movie data and previews in 2000. (*Id.* at 25.) In the latter part of 1999, plaintiff's "VideoPipeline.net" became operative, and began "streaming" trailers over the internet, accessible upon request of a customer via a "shop now" button found on retail web sites.[2] (Horo-

---

**2.** Streaming is different from downloading, which is a process by which a complete audio or video clip is delivered to and stored on a consumer's computer. Streaming, on the

vitz Aff. ¶¶ 17, 20, 21; Kolo Dep. Tr., Defs.' Ex. J, at 23–26.) This function allowed a consumer accessing Video Pipeline's website, as well as the sites of other clients who created links to Video Pipeline's website, to view an individual trailer, which is streamed from VideoPipeline.net to that website upon the consumer's request. (Horovitz Aff. ¶ 21; Kolo Dep. Tr., Defs.' Ex. J, at 23–26.) Thus, Video Pipeline converted defendant's in-store trailers from three-quarter inch broadcast quality videotape into digital form, and made them available for the public on its websites, and on the websites of subscribers of its trailer streaming service. (Horovitz Dep. Tr., Defs.' App. Ex. G, at 30–33; Canter Dep. Tr., Defs.' App. Ex. I, at 43; Defs.' App. Ex. K, Tab 37.) Plaintiff had agreements with approximately 25 home video distributors and retailers, such as Netflix, TLA, IMDB/Amazon, CDNow, Movie Gallery, and Best Buy, to provide their customers with the opportunity to view the previews prior to renting or buying the home videos. (Horovitz Aff., Pl.'s App. Ex. D, ¶ 23.)

In its trailer streaming service, plaintiff charged web site operators a direct fee on a "per-megabyte streamed" basis, generally between 2 cents to 12 cents per megabyte, linking and streaming trailers to a subscriber's website for viewing by internet customers. (Kolo Dep. Tr., Defs.' App. Ex. J, at 149–50.) In other cases, Video Pipeline charged nothing, as it did with its own web sites, or provided streaming services in exchange for exposure of its internet brands on the websites of those same operators. (Kolo Dep. Tr., Defs.' App. Ex. J, at 150–59, 182.) Plaintiff provided on-line streaming services to both retailers and non-retailers, including imdb.com and windowsmedia.com, which used the services as entertainment and informational content. (Kolo Dep. Tr., Defs.' App. Ex. J, at 151–53, 168; Pl.'s Customer Usage

Data, Defs.' App. Ex. X.) In the year 2000, plaintiff generated revenues of approximately $300,000, as a result of its trailer streaming services. (Horovitz Dep. Tr., Defs.' App. Ex. G, at 29.) For the first nine months of 2001, plaintiff generated revenues of approximately $370,000 for those services. (Horovitz Dep. Tr., Defs.' App. Ex. G, at 30.)

Plaintiff contacted Disney in 1998 regarding these internet services on its "trade website," and was referred to Donna Edwards, an employee involved with online marketing of Disney's titles. (Green Dep. Tr. 2/6/02, Pl.'s Supp.App. Ex. S, at 73–77.) Plaintiff, who made 10–20 such presentations to various movie studios and production companies, was offering two options to companies regarding internet streaming: (1) the company could pay for "premium placement" on plaintiff's internet services, including providing information to retailers prior to a full-length video's release to the public, or (2) the company could continue sending trailers to plaintiff, which would incorporate them for use on the internet at no charge to the company, after the full-length video was released for retail sale and rental. (Green Dep. Tr., Pl.'s Supp.App. Ex. S, at 80–81.) Disney never specifically agreed to provide materials for the trade website. (Id. at 77.) Video Pipeline President Jed Horovitz testified that after making a presentation to Disney employee Sarita Bhargava at the East Coast video show in Atlantic City, "I made it explicitly clear that if they continued to send stuff to us, we would continue to do the minimum, which is put it on the instore reels and put it on the Internet at no charge." (Horovitz Dep. Tr., Pl.'s Supp.App. Ex. R, at 98.)

From 1998 to 2000, Video Pipeline's Green continued to press the "premium placement" option on Disney by speaking

other hand, provides that no trace of the video is left on the consumer's computer.

to BVHE's Assistant Production Manager Adrienne Pettijohn in several telephone conversations. (Green Dep. Tr., Pl.'s Supp.App. Ex. S, at 87.) In the meantime, however, Miramax employee Ian Schafer, in anticipation of an online chat with film director Roland Joffe, contacted plaintiff to provide links to trailers of Joffe's movies, which would be accessible during, before, or after the chat.[3] (Schafer Dep. Tr., Pl.'s App. Ex. O, at 58–68.)

In September 2000, Green made another telephone call to Pettijohn at Disney, who informed Green that "due to a policy change, they weren't going to be allowing the trailers online anymore." (Green Dep. Tr., Pl.'s Supp.App. Ex. S, at 115.) On September 6, 2000, plaintiff and defendants came to an agreement expressly stipulating that plaintiff could display certain Disney trailers for in-store use only, not on the internet. (Green Dep. Tr., Defs.' App. Ex. H, at 117–18; Pettijohn Letter, Defs.' App. Ex. K, Tab 76.) Disney's attorneys also contacted plaintiff, advising that it did not have permission to use the in-store trailers on the internet, that the trailers were not cleared for online use, and demanding that plaintiff stop streaming trailers for home video retailers. (Horovitz Aff. ¶¶ 27–28; Defs.' Ex. J, at 329; McQueen Email, 9/13/00, Defs.' App. Ex. U.) Disney again wrote on September 21, 2000, advising plaintiff that it was not authorized to display or distribute the in-store trailers via the internet, that such use may constitute copyright infringement, and requesting assurance that plaintiff would cease all such unauthorized uses by September 28, 2000. (Ruhland Letter, 9/21/00, Defs.' App. Ex. BB.)

In October 2000, plaintiff filed this action seeking a declaratory judgment that its use of Disney trailers to promote home videos did not violate defendant's rights. (Compl.) Disney subsequently wrote to plaintiff a third time on November 29, 2000, advising plaintiff that BVHE was terminating its rights, authorization and permission to use the in-store trailers under the Master Clip License Agreement, and demanding that plaintiff return all the trailers subject to that agreement. (Disney Letter, 11/29/00, Defs.' App. Ex. CC.) Plaintiff complied with this request and returned the 95 trailers which Disney had designated were subject to the Agreement.[4] (Horovitz Aff. ¶ 29.)

After returning these trailers, plaintiff obtained home videos from retailers and created promotional clip previews ("clip previews") for 62 home videos that Disney had demanded plaintiff return. (Horovitz Aff. ¶ 30.) Each clip preview was less than 2 minutes long in duration, briefly displaying the Disney logo at the beginning of the video, identifying Disney as the copyright holder, and displaying the home video's title at the beginning and end. (Horovitz Aff. ¶ 31.) Each clip preview contained approximately 2 or 3 scenes from the first half of the home video, which plaintiff maintains contains sufficient information to communicate to the public the essence of the movie. (Horovitz Aff. ¶ 32.) Video

---

**3.** Plaintiff additionally alleges, without citation to record evidence, that Jeff Hare of BVHE directed plaintiff to register on Disney's website, www.movies.go.com/press, and gave her the passwords necessary to download Disney's trailers for plaintiff's use as part of its database. (Pl.'s Opp. Br. at 16 (citing to Amended Compl. ¶ 28).)

**4.** Defendants state that plaintiff has returned only 80 of the in-store trailers that were pro-

vided prior to February 1993. (*See, e.g.,* Defs.' App. Ex. K, Tab 11.) Defendants assert that plaintiff continues to possess hundreds of other three-quarter inch broadcast videotape masters of the in-store trailers that were provided to it under the Agreement, (Horovitz Dep. Tr., Defs.' App. Ex. F, at 112–13), and have continued to stream approximately 343 in-store trailers from December 2000 to the present date. (Defs.' Reply Br. at 1.)

Pipeline streamed the trailers and clip previews to a website it owned, Videodetective.com, allowing consumers to view the clip preview at the click of a button when browsing through the list of movie titles on this website. (Horovitz Aff. ¶ 20.)

Although told to discontinue use of Disney's trailers online, plaintiff allegedly also engaged in copying authentic trailers from BVHE home video releases on which they appeared, using approximately 34 trailers in its online internet streaming business.[5] (Canter Dep. Tr., Defs.' App. Ex. I, at 130–32, 161–62, 164–72; Defs.' App. Ex. K, Tabs 6–8, 11–16; List of Disney Trailers, Defs.' App. Ex. C.) These emails between Video Pipeline employees Anne Green and Mitch Canter in November 2000 indicate that they actively rented Disney movies to locate certain Disney previews that might be found at the beginning of rented movies. (*Id.*) For example, Canter wrote, "I'm planning on renting Gone in 60 Seconds from Touchstone on the chance I'll find a title we need." (Canter Email, 11/28/00, Def.'s App. Ex. K, Tab 14.)

Plaintiff in its Amended Complaint seeks, in Count One, a determination under the Declaratory Judgment Act that, from February 9, 1993 to September 13, 2000, its use on Video Pipeline.com of the Promotional Previews provided by Disney does not infringe any copyright or violate any rights of defendant. (Amended Compl. ¶ 37.) In Count Two, plaintiff seeks a declaratory judgment that its creation and display of the Video Pipeline Previews for use by home video distributors and retailers to promote the sales or rentals of home video products at the point-of-sale does not infringe any copyright or violate any right of defendant and that such creation and display constitutes fair use. (*Id.* ¶ 49.)

In 2002, this Court preliminarily enjoined plaintiff from streaming the 62 clip previews or from making any more clip previews of Disney home videos. (*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,* 192 F.Supp.2d 321 (D.N.J. 2002).) After plaintiff amended its complaint to include the clip previews, (Pl.'s Suppl. & Amended Compl., Pl.'s Ex. A), Disney counterclaimed against plaintiff, alleging copyright infringement with respect to the Disney trailers (Count One), copyright infringement with respect to plaintiff's clip previews [6] (Count Two), federal unfair competition/false designation under the Lanham Act (Count Three), and state law claims for unfair competition (Count Four), breach of contract (Count Five), unjust enrichment (Count Six), conversion (Count Seven), and replevin (Count Eight). (Disney's Answer to Suppl. & Amended Compl. & Amended Counterclaims, Pl.'s

---

**5.** Disney provides a list of the 34 copied Disney trailers at Exhibit C of its Appendix. Disney also provides a list of the 62 clip previews created by plaintiff, the subject of the preliminary injunction, at Exhibit B. In addition, Disney's Exhibit A, listing the in-store trailers it sent to plaintiff, is divided into three sections. A–1 is a list of 220 in-store trailers provided in response to request letters which exclusively requested them for in-store programs; A–2 is a list of 102 in-store trailers which were provided in response to a later form of request letter which make passing, non-specific reference to internet uses, and A–3 is a list of 21 in-store trailers which BVHE provided to plaintiff as a courtesy, without a specific letter request, until 2000.

**6.** Disney notes that only 61 clip previews are the subject of the present summary judgment motion, as Miramax expressly provided the clips for the 62nd movie *Everybody's Famous* to plaintiff for the express purpose of creating a trailer. (Defs.' Reply Br. Copyright Claim, at 1 n. 1.) In addition, plaintiff asserts that it received 18 trailers from Disney's Theatrical Publicity Department for online use, and others from Miramax for the same purpose. (Pl.'s Br. at 14–16.) These trailers are not subjects of the instant motion either. (Defs.' Reply Br. Copyright Claim, at 1 n. 1.)

Ex. B.) This Court dismissed defendant's counterclaim for unjust enrichment in its July 26, 2002 Opinion. (*Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,* 210 F.Supp.2d 552 (D.N.J.2002).)

Plaintiff brings this motion for summary judgment on Counts I and II of its Amended Complaint seeking a declaratory judgment that its copying of Disney's copyrighted works does not constitute copyright infringement and that it constitutes fair use. In addition, plaintiff also moves for summary judgment against BVHE and Miramax on Counts I through VI of BVHE and Miramax's Amended Counterclaims, that is, copyright infringement, federal trademark infringement and state law claims for breach of contract, and unfair competition. Defendant also moves for summary judgment on its claims for copyright infringement with respect to post-December 2000 conduct, Lanham Act violations, and state law claims.

## II. *DISCUSSION*

Plaintiff Video Pipeline moves for summary judgment on its declaratory judgment claims on the ground that its use of its clip previews and of Disney's trailers is consistent with the fair use statute and is consistent with copyright law's policy to promote learning and disseminate information. In addition, plaintiff moves for summary judgment on defendant Disney's copyright infringement claim relating to Disney's trailers, arguing that its use of the trailers is fair use, and that Disney is misusing its copyright and has not registered the trailers. Furthermore, plaintiff argues that it did not breach the 1988 Master Clip License Agreement with BVHE, that the trademark claim for money damages fails because there was no actual consumer confusion, and the unfair competition claim also fails because plaintiff does not compete with defendants and in fact promotes the home video sales and rentals of defendant's movies.

Defendant and counterclaim-plaintiff BVHE moves for partial summary judgment on its copyright infringement, Lanham Act, and state law claims. Defendant argues that plaintiff's digitization and internet streaming of the in-store trailers, the clip previews and copying of Disney trailers occurring post-December 2000 constitute copyright infringement, and that it is entitled to summary judgement on its breach of contract, state unfair competition, replevin and conversion claims.

### A. *Summary Judgment Standard*

A court may grant summary judgment when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir. 1983). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party. *See Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1080–81 (3d Cir.1996). Once the moving party has carried its initial burden of establishing the absence of a genuine issue of material fact, the non-moving party must do more than rely only "upon bare assertions, conclusory allegations or suspicions." *Gans v. Mundy,* 762 F.2d 338, 341 (3d Cir.1985), *cert. denied,* 474 U.S. 1010, 106 S.Ct. 537, 88 L.Ed.2d 467 (1985) (citation omitted). If the non-movant's evidence is merely "colorable" or is "not significantly probative," the court may grant

summary judgment. *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505.

### B. *Defendant's Copyright Claims*

#### 1. *Copyright Infringement*

■ Defendant moves for summary judgment on its copyright infringement claims with respect to plaintiff's conduct occurring on or after December 1, 2000, regarding its use of the in-store trailers, the clip previews, and the subsequently copied Disney trailers.[7] *See* Def.'s Br. at 20. Copyright infringement under § 106 of the Copyright Act, 17 U.S.C. § 106, is established when a party establishes two elements: (1) it owns the copyrighted material; and (2) the alleged infringer has engaged in unauthorized copying within the meaning of § 106 of the Copyright Act. *See Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 290 (3d Cir.), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991) (citations omitted). Under § 106 of the Copyright Act, unauthorized "copying" means to violate any of the five exclusive rights reserved to copyright owners: (1) the right to reproduce the copyrighted work, (2) the right to prepare works derived from the original copyrighted work, (3) the right to distribute copies of the work, (4) the right to perform the work, and (5) the right to display the work.[8] 17 U.S.C. § 106.

In this case, plaintiff does not dispute the first element, that BVHE owns the copyrighted motion pictures, from which Disney's promotional trailers for in-store use, the trailers which plaintiff copied, and Video Pipeline's clip previews were created. *See also* McQueen Cert. ¶ 21 & Ex. P. Here, under the second element, plaintiff also concedes that "[t]he Trailers created and distributed by Disney are derivative works under § 106(2)." Pl.'s Sum. J. Br. at 28 (citing *Lamb v. Starks*, 949 F.Supp. 753, 756 (N.D.Cal.1996)). With respect to the clip previews created by plaintiff, this Court previously held that, in the context of the preliminary injunction motion, these clip previews also constitute derivative works, public performances, and public displays under § 106. *See Video Pipeline*, 192 F.Supp.2d at 330–32.

The Court must address whether creating digital copies of defendant's trailers of its copyrighted motion pictures for streaming on the internet, which plaintiff engaged in after defendant informed it that online streaming of the in-store trailers was unauthorized, also violates the copyright owner's rights under § 106. Much like the trailers copied in *Lamb v. Starks, supra,* the copying of the Disney trailers, which plaintiff obtained in part by renting home videos, also infringes upon the copyright holder's right to prepare derivative works under § 106(2). *See Lamb v. Starks*, 949 F.Supp. at 756 (holding that copying of plaintiff's trailer of copyrighted movie infringed on right to prepare derivative works); *see also Perry v. Sonic Graphic Sys., Inc.*, 94 F.Supp.2d 616, 621 (E.D.Pa. 2000) (holding that defendant's use of plaintiff's photographs on web site without permission infringed on copyright owner's right under § 106(1)-(3)). In addition, where defendant's partial summary judgment motion as to its copyright infringement claims relate only to the period after December 1, 2000, there is evidence that plaintiff conducted the streaming of its clip previews from November 3, 2000 to March 2002, when this Court granted defendant's preliminary injunction motion with respect to such use. *See also* McQueen Cert.,

---

**7.** Defendant selects December 1, 2000 as the "on or after" date because defendant states that by December 2000, plaintiff was aware of its unauthorized use of defendant's trailers.

**8.** The sixth exclusive right, the right to perform the copyrighted work, pertains only to sound recordings. 17 U.S.C. § 106.

Defs.' App. Ex. D, ¶ 10. The record also indicates that plaintiff's digital copying of 34 of defendant's trailers occurred during this same time period. Defendant thus establishes a prima facie case of copyright infringement.

### 2. *Estoppel*

■ Defendant contends that estoppel provides no defense to plaintiff's copying of the in-store trailers. Plaintiff claims that defendant is equitably estopped from asserting copyright infringement of the in-store trailers on grounds that defendant implicitly authorized digitization and internet streaming of them. For estoppel to apply, an alleged infringer must show that the copyright owner was aware of the infringing conduct and yet acted in a way that induced the infringer to reasonably rely upon such action to his detriment. *Ty v. West Highland Publishing, Inc., Highview Recording, LLC*, No. 98 C 4091, 1998 WL 698922, *10–11 (N.D.Ill. Oct.5, 1998); *see also Serv. & Training, Inc. v. Data Gen. Corp.*, 963 F.2d 680, 690 (4th Cir. 1992) ("To avail themselves of an estoppel defense, however, appellants must show that Data General (1) misrepresented or concealed material facts, (2) intended or expected that appellants would act upon those misrepresentations or concealments, and (3) had actual or constructive knowledge of the true facts.") (citation omitted).

■ Plaintiff fails to make the requisite showing in this case. Plaintiff contacted Disney in 1998 regarding their internet services on its "trade website," and was referred to Donna Edwards, an employee involved with online marketing of Disney's titles. Green Dep. Tr. 2/6/02, Pl.'s Supp. App. Ex. S, at 73–77. The record shows that certain employees of defendant, including Donna Edwards and Sarita Bhargava, had discussions with Green regarding making the Disney trailers available on the internet, but Disney never specifically agreed to provide materials for plaintiff's proposed trade website. *Id.* In addition, the culmination of the discussions resulted in defendant informing plaintiff that it was not interested in plaintiff's internet projects, and that defendant was exploring its own internet strategies. Horovitz Dep. Tr., Defs.' App. Ex. F, at 127–28; Green Dep. Tr., Defs.' App. Ex. H, at 79–85. Indeed, plaintiff also never requested or informed defendant that it intended to digitize and stream all Disney trailers.

There is no indication that defendant knew that the streaming of its products was occurring, let alone that it gave its approval of such conduct, thereby allowing plaintiff to continue with its internet activities relying upon such acquiescence. The record demonstrates that a lower-level employee of defendant contacted plaintiff to provide access to the trailer streaming for an online chat with a film director. However, to the extent that defendant seeks summary judgment of its copyright infringement claims, this motion is brought only as to plaintiff's post-December 2000 conduct. Defs.' Br. Sum. J. Copyright, at 20. By that time, after defendant made several communications to plaintiff demanding that it cease streaming of defendant's in-store trailers online, there could have been no possible confusion as to defendant's intentions.

With respect to post–2000 December conduct, no reasonable fact finder could find the requisite elements for estoppel, and plaintiff is therefore not entitled to its defense as a matter of law.

### 3. *Registration of Copyright*

■ Plaintiff moves for summary judgment as to Disney's copyright infringement claim relating to Disney's trailers on the ground that Disney has not registered its trailers and this Court therefore lacks jurisdiction over such claim. Plaintiff con-

tends that before filing a copyright infringement suit based on those derivative works, Disney must first have formally registered the trailers with the United States Copyright Office, citing to 17 U.S.C. § 411(a), and the Sixth Circuit's decision in *Murray Hill Publ'ns, Inc. v. ABC Communications, Inc.*, 264 F.3d 622, 630 (6th Cir.2001). Section 411(a) provides that

> Except for an action brought for a violation of the rights of the author under section 106A(a), and subject to the provisions of subsection (b), no action for infringement of the copyright in any United States work shall be instituted until registration of the copyright claim has been made in accordance with this title.

17 U.S.C. § 411(a). Registration is a prerequisite to filing a copyright infringement suit, with very limited exceptions. *Murray Hill*, 264 F.3d at 630 (citing 17 U.S.C. § 411(a); *M.G.B. Homes, Inc. v. Ameron Homes Inc.*, 903 F.2d 1486, 1488 (11th Cir.1990)).

In *Murray Hill*, plaintiff brought a copyright infringement claim for a song it allowed a radio personality to use as the theme for a morning radio show. The song was a re-recorded version, with added lyrics, of plaintiff's copyrighted composition. The Sixth Circuit affirmed the district court's dismissal of the action for lack of jurisdiction over the copyright infringement claim with respect to the song, which was not registered with the copyright office. However, the Sixth Circuit recognized that the claim of infringement based on the underlying registered work had been waived because plaintiff had granted a license to defendant by implication.

Unlike *Murray Hill*, where the copyright claim was based on infringement of the unregistered derivative work, defendant's counterclaims here pertains, rather, to the alleged infringement of not just the trailers themselves, but also the underlying copyrighted and registered motion pictures. *See* Amended Counterclaims, ¶¶ 35–37. The basis of defendant's infringement counterclaim relating to its trailers is that plaintiff copied Disney's trailers which themselves are composed entirely from Disney's registered motion pictures. *See* Defs.' App. Ex. A. Registration of the underlying copyrighted work is sufficient to sustain a copyright infringement action pertaining to the derivative works, in this case, the in-store trailers. *See, e.g., Well–Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, No. 98–CV–7964, 2002 WL 1455180, *4–7 (E.D.N.Y. June 26, 2002) (copyright owner's failure to register derivative 48–inch doll did not affect owner's right to sue on basis of 20–inch version), *Mattel, Inc. v. Robarb's, Inc.*, 139 F.Supp.2d 487, 497–98 (S.D.N.Y.2001) (defendant's copy of plaintiff's unregistered derivative work infringed on plaintiff's copyright in registered work, elements of which were included in plaintiff's derivative work and infringing work). In *Well–Made Toy,* the district court stated:

> By definition, a derivative work contains elements of underlying works that themselves may be subject to copyright; the copyright in the derivative work extends only to those elements *original to the derivative work.* It follows that where the preexisting works is registered, but the derivative work is not, a suit for infringement may be maintained as to any preexisting work, but not as to any element original to the unregistered derivative work.

*Well–Made Toy,* 2002 WL 1455180, at *6 (citing *Mattel,* 139 F.Supp.2d at 496, 498; 2 Nimmer § 7.16[B][2] at 7–165) (emphasis in original). In this case, where all of the allegedly infringing work is taken entirely from the copyrighted, registered work, the infringement counterclaim is maintainable. Even if the allegedly infringing works were taken from the trailers themselves,

all of the trailers contain work directly excerpted from the copyrighted works, and thus include no original element that would preclude the viability of defendant's infringement counterclaim. Defendant's copyright infringement counterclaims, to the extent they are based on the underlying registered and copyrighted materials, are thus maintainable.

*Lamb v. Starks* supports this conclusion. As discussed above, defendants in that case had copied the trailers of plaintiff's copyrighted motion picture, and compiled the trailers with other trailers on a compilation video tape. The district court determined that plaintiff had established a prima facie case of copyright infringement with respect to the copyrighted movie, and denied defendant's motion for summary judgment. The court notably rejected defendant's argument that there could be no infringement on the basis that the trailer itself was not copyrighted, stating that the motion picture from which the trailer was derived is copyrighted.

Under the cases cited above, plaintiff's argument fails. Contrary to plaintiff's assertion, the Sixth Circuit's decision in *Murray Hill* provides no support that jurisdiction is lacking over a copyright infringement action which is based on the underlying copyrighted and registered work. Plaintiff's motion for summary judgment on the ground that this Court lacks jurisdiction over defendant's copyright infringement claim relating to trailers will therefore be denied.

### 4. Copyright Misuse Defense

 Plaintiff moves for summary judgment on defendant's copyright claims on the ground that Disney is misusing its copyright, under the copyright misuse doctrine, because it seeks to control information available to the public, contrary to the purpose of the Copyright Act, citing to *Lasercomb America, Inc. v. Reynolds*, 911

F.2d 970, 976–77 (4th Cir.1990) and *Practice Mgmt. Info. Corp. v. American Med. Ass'n*, 121 F.3d 516, 520 (9th Cir.1997). The defense of copyright misuse "forbids the use of the copyright to secure an exclusive right or limited monopoly not granted by the Copyright Office and which it is contrary to public policy to grant." *Lasercomb*, 911 F.2d at 977 (citing *Morton Salt Co. v. G.S. Suppiger*, 314 U.S. 488, 492, 62 S.Ct. 402, 86 L.Ed. 363 (1942)). Copyright misuse does not invalidate a copyright, but precludes its enforcement during the period of misuse. *Practice Mgmt.*, 121 F.3d at 520 (citing *Lasercomb*, 911 F.2d at 979 n. 22).

In both *Lasercomb* and *Practice Management*, the copyright owner engaged in copyright misuse because it attempted to extend its monopoly beyond the scope of the copyright laws in an anticompetitive manner. For example, in *Lasercomb*, a manufacturer of steel rule dies had included clauses in its standard licensing agreement which prevented the licensee from attempting to develop software that had the same utility as that provided by the licensed software. The *Practice Management* case likewise involves the American Medical Association requiring its licensees of its medical procedures coding system to not use any competing coding systems.

Unlike *Practice Management* and *Lasercomb*, plaintiff is not arguing that defendant precluded its licensees from using the products of its competitors or from creating their own products that could compete with those of defendant. Nor is there any allegation that Disney required its licensees to carry and sell its products to the exclusion of others. With respect to movie trailers, defendant has not required authorized users of its trailers to forego the use of trailers for competing products. In this case, defendant provided authentic trailers to plaintiff during their contractual relationship free of any anticompetitive re-

strictions, for the express purpose of being compiled with trailers of Disney's competitors for display in retailers' stores.[9]

Here, plaintiff essentially argues that persons not a party to defendant's licensing agreement should be entitled to use material from defendant's copyrighted products for their advertising. Although plaintiff cites to the fact that Disney allows only the companies it licenses to use its trailers, requiring that the trailers may not be used in ways that are derogatory or critical of the entertainment industry, BVHE and its officers, divisions, and subsidiaries, and the materials from which the trailers were taken or of any person involved with the production of the motion picture, *see* Pl.'s Sum. J. Br. at 27, there is no evidence that Disney included anti-competitive clauses in its licensing agreements.

Neither *Lasercomb* nor *Practice Management* stand for plaintiff's position. As described in those cases, the copyright misuse doctrine is appropriate where the copyright holder attempts to preclude its licensee, via clauses of their licensing agreement, from using or creating products that could compete with the copyrighted work. That doctrine is inapplicable here, where no such anti-competitive clauses are at issue. Plaintiff's attempt to invoke the copyright misuse defense thus fails, and it is therefore not entitled to the copyright misuse defense. The merit of plaintiff's alternative theory for the alleged lawful use of defendant's copyrighted works, including the fair use defense, will be discussed below.

### 5. *Implied License*

■ Plaintiff additionally argues that BVHE, by providing the trailers to plain-

tiff without restriction, created an implied license for plaintiff to use the trailers consistent with the purpose for which they were provided, that is, promoting the full-length home videos at the point-of-sale. Under the Copyright Act, the owner of a copyright can transfer ownership of the copyright by selling it or by exclusively licensing it. *MacLean Assocs., Inc. v. William M. Mercer–Meidinger–Hansen, Inc.*, 952 F.2d 769, 778 (3d Cir.1991) (citing 17 U.S.C. § 101). Exclusive licenses, however, must be in writing. *MacLean*, 952 F.2d at 778 (citing 17 U.S.C. § 204(a); *Effects Assocs. v. Cohen*, 908 F.2d 555, 556 (9th Cir.1990), *cert. denied*, 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1086 (1991)). A nonexclusive license may arise by implication where the creator of a work at a defendant's request "hand[s] it over, intending that defendant copy and distribute it." *Effects Assocs.*, 908 F.2d at 558.

The facts in this case demonstrate that defendant provided plaintiff with trailers without the usual designation letter, outlining the terms of the trailers' use, for a period of time after 1993. This occurred as a result of a back-up in paperwork regarding the use of these trailers. *See* McQueen Dep. Tr., Pl.'s App. Ex. L, at 33–34. To the extent that defendant's partial summary judgment motion as to its copyright infringement claims is made with respect to plaintiff's streaming of the in-store trailers, the clip previews, and the copied Disney trailers post–December 2000, by which point plaintiff was informed that streaming of such trailers or previews online was unauthorized, there can be no finding that defendant created an implied

---

**9.** Defendant does require its licensees to use the authorized trailers for the advertising of its copyrighted images and home videos. That defendant should not be allowed to control the advertising of its copyrighted materials is the essence of plaintiff's claim. As defendant notes, this is plaintiff's indirect attempt to raise a First Amendment claim. *See* Def.'s Opp. Br. at 20.

license for plaintiff to continue such use. The record demonstrates that in fall 2000, defendant made several communications to plaintiff, informing it that its use of the Disney trailers on the internet was unauthorized, and demanding plaintiff to discontinue all such unauthorized uses. *See* McQueen Cert., Defs.' App. Ex. D, ¶ 5. Furthermore, defendant had terminated the parties' Master Clip License Agreement in November 2000, and demanded that plaintiff return all trailers subject to that Agreement. Horovitz Aff., Defs.' App. Ex. ¶ 29.

To the extent that defendant's partial summary judgment motion as to its copyright infringement claims relate only to plaintiff's actions post-December 2000, by which time the parties' Master Clip License Agreement had terminated and defendant had demanded all of its in-store trailers back, plaintiff's argument that defendant had created an implied license allowing it to use plaintiff's trailers on the internet has no merit.[10]

### 6. *Database as Derivative Work*

■ Although plaintiff conceded that the trailers provided by Disney constitute derivative works under § 106 of the Copyright Act, it nevertheless argues that plaintiff's database of clip previews and trailers does not constitute a derivative work, citing to *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512 (7th Cir.2002). In *Ty*, the Seventh Circuit considered whether a company which published a series of books using photographs of copyrighted Beanie Babies was entitled to a trial on its defense

of fair use. The Seventh Circuit, after consideration of the factors mentioned above, reversed the summary judgment decision, and remanded to the district court. The photographs, themselves considered derivative works of the copyrighted work, were used in a series of collector's guides on Beanie Babies, and the Seventh Circuit determined that such books may constitute complements of, rather than substitutes for, the copyrighted material.

Plaintiff's attempt to liken its database of clip previews to the "collector's guide" in *Ty* is unavailing, as the database in this case in no way resembles a distinct and separate product that complements the copyrighted materials, as the district court in *Ty* deemed the collector's guide. Furthermore, the database in this case is merely a name for the collection of clip previews and trailers, each of which are derivative works of the copyrighted materials, which plaintiff aggregates, in theory, online. Although the court in *Ty* stated that collector's guides without photographs "would sink like a stone in the marketplace," plaintiff in this case is not seeking use of merely the still photographic images of the copyrighted movies. Were it to do so, its argument would hold more force. Plaintiff's argument therefore fails.

### C. *Plaintiff's Declaratory Judgment Claims*

### 1. *Copyright Clause*

Plaintiff moves for summary judgment on its declaratory judgment counts, stating that its use of the clip previews is inconsis-

---

**10.** Plaintiff additionally opposes defendant's summary judgment motion on the ground that Disney cannot impose on plaintiff contractual restrictions Disney may have agreed to with others because plaintiff is not a party to those contracts. *See* Pl.'s Opp. Br. at 33. This argument responds to defendant's allegation that it may be open to potential liability due to plaintiff's use of the trailers. Plaintiff fails to articulate the relevance of that issue to defendant's copyright claim, and the case it cites for support, *EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 460 (6th Cir.1999) (holding that employee's signing of arbitration act did not preclude EEOC's action to pursue Title VII relief on her behalf), is inapposite.

tent with both the purpose and basic conditions for copyright contained in the Constitution's copyright clause. Under the Constitution, "[t]he Congress shall have power ... [t]o Promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. 1, § 8, cl. 8. The Supreme Court has stated that the Copyright Clause is " 'both a grant of power and a limitation.' " *Eldred v. Ashcroft*, 537 U.S. 186, 123 S.Ct. 769, 154 L.Ed.2d 683, (2003) (holding that Copyright Term Extension Act of 1998 violates neither the Copyright Clause of Constitution nor the First Amendment) (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 5, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)). The " 'constitutional command,' " the Supreme Court has recognized, "is that Congress, to the extent it enacts copyright laws at all, create a 'system' that 'promote[s] the Progress of Science.' " *Eldred*, 123 S.Ct. at 785 (quoting *Graham*, 383 U.S. at 6, 86 S.Ct. 684). The copyright clause, as stated by the Supreme Court, "is intended to motivate the creative activity of authors and inventors by the provision of a special reward, and to allow the public access to the products of their genius after the limited period of exclusive control has expired." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 429, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984).

Although plaintiff asserts that it is entitled to protection under the copyright clause, it fails to articulate how the Constitutional copyright clause provides a defense to its copying and internet streaming of the trailers, or the legal standard by which such a determination can be made.

Contrary to plaintiff's assertion, not all uses that foster the free flow of information and exchange of ideas are entitled to protection under federal copyright law. *See, e.g., Stewart v. Abend*, 495 U.S. 207, 228–29, 236–38, 110 S.Ct. 1750, 109 L.Ed.2d 184 (1990). In *Stewart*, the Supreme Court stated that

> [A]lthough dissemination of creative works is a goal of the Copyright Act, the Act creates a balance between the artist's right to control the work during the term of the copyright protection and the public's need for access to creative works. The copyright term is limited so that the public will not be permanently deprived of the fruits of an artist's labors. But nothing in the copyright statutes would prevent an author from hoarding all of his works during the term of the copyright. In fact, this Court has held that a copyright owner has the capacity arbitrarily to refuse to license one who seeks to exploit the work.

*Stewart*, 495 U.S. at 228, 110 S.Ct. 1750 (citations omitted). Thus, where no legal standard determining protection under the Constitutional copyright clause is apparent, plaintiff's argument that it is entitled to the copyright clause's protection fails.

2. *Fair Use Defense*

Plaintiff argues that its use of the Disney trailers and its own clip previews on the internet constitutes fair use because the use complements or promotes the copyrighted work.[11] " 'Fair use is a mixed question of law and fact.' " *Ty*, 292 F.3d at 516 (quoting *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 560, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)). Thus, the issue " 'may be resolved on summary judgment if a reasonable trier of fact

11. Plaintiff refers to both the Disney trailers and clip previews, without making any distinction. Presumably, plaintiff seeks a fair use determination with respect to the Disney trailers provided for in-store use, the clip previews it created, and the trailers plaintiff later digitally copied from the trailers shown at the beginning of Disney's motion picture videos.

could reach only one conclusion'—but not otherwise." *Ty*, 292 F.3d at 516 (quoting *Narell v. Freeman*, 872 F.2d 907, 910 (9th Cir.1989)). The "fair use" defense "allows the public to use not only facts and ideas contained in a copyrighted work, but also expression itself in certain circumstances." *Eldred*, 123 S.Ct. at 789. The "fair use" defense is codified at 17 U.S.C. § 107, which states that

> [T]he fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright.

17 U.S.C. § 107. "The fair use defense affords considerable 'latitude for. scholarship and comment,' and even for parody." *Eldred*, 123 S.Ct. at 789 (quoting *Harper & Row*, 471 U.S. at 560, 105 S.Ct. 2218; *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 114 S.Ct. 1164, 127 L.Ed.2d 500 (1994)). The factors to be considered in determining whether one is entitled to the fair use doctrine include, but are not limited to, the following:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. This Court previously held that plaintiff had not shown a probability of success on the merits of its fair use defense in the context of the prelimi-

nary injunction motion. *See Video Pipeline*, 192 F.Supp.2d at 335–43. That prediction is reexamined now in the context of summary judgment motion practice, enlightened by the completion of plenary discovery creating a complete factual record.

### a. *Purpose and Character of Use*

■ Under this factor, the Supreme Court has stated that the use of a copyrighted work for a commercial purpose "tends to weigh against a finding of fair use." *Campbell*, 510 U.S. at 585, 114 S.Ct. 1164 (quoting *Harper & Row*, 471 U.S. at 562, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985)). The Supreme Court has also stated that

> The central purpose of this investigation is to see ... whether the new work merely supersede[s] the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is transformative.

*Campbell*, 510 U.S. at 579, 114 S.Ct. 1164. Thus, the more transformative the work, the less important the other factors, including commercialism, become. *Kelly v. Arriba Soft Corp.*, 280 F.3d 934, 940 (9th Cir.2002) (citing *Campbell*, 510 U.S. at 579, 114 S.Ct. 1164).

Plaintiff raises *Ty v. Publications International, supra*, and *Kelly v. Arriba Soft Corp.*, 280 F.3d 934 (9th Cir.2002), as support for its claim. In *Ty*, as mentioned above, the Seventh Circuit considered whether a company which published a series of books using photographs of copyrighted Beanie Babies was entitled to a trial on its defense of fair use. The Seventh Circuit, after consideration of the factors mentioned above, reversed the summary judgment decision, and remanded to the district court.[12] The photographs,

---

**12.** The Seventh Circuit specifically noted that

while summary judgment was not warranted

themselves considered derivative works of the copyrighted work, were used in a series of collector's guides on Beanie Babies, and the Seventh Circuit determined that such books may constitute complements of, rather than substitutes for, the copyrighted material.

In *Kelly*, the Ninth Circuit considered whether a web site operator that included plaintiff's copyrighted photographs as part of its search engine database constituted a fair use. The Ninth Circuit held that the use of thumbnail-size images of the photographs was a fair use, but that the display of the full image of the copyrighted work that appears upon double-clicking the thumbnail-size image constitutes a violation of plaintiff's exclusive right to publicly display his works.

With respect to the transformative nature under the first factor, the Ninth Circuit determined that the photographer's use of the images, in terms of artistic expression, serves a different function than the search engine's use of improving access to information on the internet. Because the thumbnail did not supersede the photographer's use but had created a different purpose for the images, the web operator's use of the image was transformative, favoring a finding of fair use. With respect to the full-size image, the court determined that the full-size images did not enhance the search engine, but acted as illustrations or artistic expression. In other words, the full–size images, likely the end products themselves, did not act as a means of accessing other information on the internet, and thus the search engine would function the same without them, thereby serving a purpose no different than that of the photographer.

The holdings of the Seventh and Ninth Circuits provide support for the proposition that a fair use defense is favored if the copying complements the use of the copyrighted works and serves a transformative purpose, that is, a purpose different than that of the copyright owner. Plaintiff's use of the copyrighted material in this case furthers the purpose of allowing customers of authorized retailers selling Disney motion pictures to access the streaming of the clip previews and trailers provided by plaintiff by the click of a button on the internet. Like the collector's guide in *Ty*, the clip previews and trailers in this case are informational, as they provide segments of the actual copyrighted movie to inform customers of the movie's story or theme. Unlike *Ty*, however, the clip previews and trailers, although accumulated on a database, do not add additional or critical evaluative information to the copyrighted works, as they are only truncated versions of the movies, with choice scenes selected and put together. Although the clip previews and trailers in this case are not clear substitutes for the copyrighted works, they do not complement the motion picture rentals or sales by adding information similar to a collectors' guide nor do they represent an entirely different product line that consumers of the movie may also be interested in purchasing, as in *Ty*.

Plaintiff's use of the copyrighted work is to increase sales of defendants' movies, though for its own profit and for profit of different retailers and distributors. The clip previews and trailers are not created for the benefit of collectors of the copyrighted works, nor do they provide an additional fora of products to which consumers of the copyrighted works would also be drawn. Importantly, home video retailers and other distributors of these motion picture who generally pay for

with regard to all the books at issue, it might be warranted with respect to some of them, stating that it did not preclude consideration

on remand of the possibility of partial summary judgment.

plaintiff's services on a per-megabyte basis, not just renters and purchasers of the copyrighted movie, consume this type of product.

The retailers and distributors of the copyrighted work and the owners of the copyrighted work have a similar purpose, that of selling and renting the videos of the motion picture movies. Especially here, where Disney has actually entered the market by creating its own trailers for promoting its movies, it cannot be said that plaintiff has created a transformative purpose, or that its purpose is substantially different than that of defendants. Because plaintiff has not changed the purpose or character of the use of the copyrighted images, the first factor strongly favors defendant.

b. *Nature of the Copyrighted Work*

■■■ This second factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164 (citing cases). "The law generally recognizes a greater need to disseminate factual works than works of fantasy or fiction." *Harper & Row*, 471 U.S. at 563, 105 S.Ct. 2218 (citing Gorman, Fact or Fantasy? The Implications for Copyright, 29 J. Copyright Soc. 560, 561 (1982)). " 'Works that are creative in nature are closer to the core of intended copyright protection than are more fact-based works.' " *Kelly*, 280 F.3d at 942-43 (quoting *A & M Records*, 239 F.3d at 1016 (internal citation omitted)).

The fact that the copyrighted works in this case are fictional affords defendants greater copyright protection than would be afforded to one whose work is purely factual. Plaintiff, however, asserts that the fact that the home videos are widely accessible to the public favors fair use. It is true that a purpose of the Copyright Act is to disseminate information and promote learning, and that published works are more likely to qualify as fair use because the first appearance of the artist's expression has already occurred. *See, e.g., Kelly*, 280 F.3d at 943 (finding that the this factor slightly favored copyright owner) (citing *Harper & Row*, 471 U.S. at 564, 105 S.Ct. 2218 (discussing fair use defense as narrower with respect to unpublished works because the "author's right to control the first public experience of his expression weighs against such use of the work before its release")). Even where the copyright owner's images appeared on the internet before the alleged infringer began using those images on its search engine, however, as in *Kelly*, the Ninth Circuit has stated that this factor slightly weighs in favor of the copyright owner. Furthermore, the Supreme Court in *Harper & Row* noted the narrower scope of the fair use defense with respect to unpublished works, in that case an unpublished autobiography which a magazine had excerpted before its publication. That situation is lacking here, where the copyrighted materials were published before plaintiff first began its use of the copyrighted material. The clip previews and the Disney trailers are works of fiction and fantasy, not factual works. Accordingly, this factor weighs against the finding of a fair use defense.

c. *Amount and Substantiality of the Portion Used in Relation to the Copyrighted Work as a Whole*

The issue under the third factor is whether " 'the amount and substantiality of the portion used in relation to the copyrighted work as a whole,' ... are reasonable in relation to the purpose of the copying." *Campbell*, 510 U.S. at 586, 114 S.Ct. 1164. This factor requires consideration of the quantity of the material used, as well as their quality and importance. *Id.*

at 587, 114 S.Ct. 1164; *see also Harper & Row,* 471 U.S. at 564–65, 105 S.Ct. 2218 ("[N]o plagiarist can excuse the wrong by showing how much of his work he did not pirate.") (citations omitted).

In the case of the clip previews, plaintiff uses selected segments from the motion pictures. Plaintiff states that such use is designed to attract audiences to, not away from, the copyrighted home videos, and thus its clip previews complement and promote the videos. While the clip previews are very short, only less than 2 minutes in duration, whereas the actual movie may be over an hour to two hours long, they are intended to give consumers an idea of the theme or storyline of the movie. To this extent, the choice of selecting scenes to be played in the clip preview is not uninformed, nor arbitrary. As this Court noted in the Opinion granting the preliminary injunction,

> Much as taking passages from the "heart" of a book may be used to demonstrate the essence of the copyrighted work, so may an aggregation of scenes from a motion picture be a reflection of the general themes and tones which one may expect from viewing the entire movie. Indeed, it is designed and intended to be so, in order to apprise the customer of the overall premise. That the clip previews, composed entirely from scenes from the copyrighted movie, can depict no other readily identifiable piece of work, and are meant to do nothing other than that, weighs against the applicability of the fair use defense under this third factor.

*Video Pipeline,* 192 F.Supp.2d at 340.

In *Harper & Row,* for instance, the Supreme Court considered the expressive value of the excerpts of an unpublished autobiography which a magazine published before its publication. The Supreme Court discounted the fact that an infringing work may constitute a small portion of the copyrighted work, noting that a taking "may not be excused merely because it is insubstantial with respect to the *infringing* work." *Harper & Row,* 471 U.S. at 565, 105 S.Ct. 2218 (emphasis in original) (noting, however, that the fact that a substantial portion of an infringing work was copied verbatim is evidence of the qualitative value of the copied material). Rather, the Supreme Court considered that the direct takings from the unpublished manuscript constituted over 13% of the infringing article. *See id.* at 565–66, 105 S.Ct. 2218 (citing *Meeropol v. Nizer,* 560 F.2d 1061, 1071 (2d Cir.1977) (copyrighted letters constituted less than 1% of infringing work but were prominently featured)). Because of the expressive value of the excerpts and their key role in the infringing work, this appeared to favor against a finding of fair use.

In this case, while the length of the clip previews is only a small percentage of the actual length of the movie, the selected scenes nevertheless consist entirely of portions of the copyrighted work. No new element is added to transform the work, other than the splicing of scenes to fit within a 2–minute time frame. The same is true of the copied trailers which plaintiff streamed online. Plaintiff copies defendant's trailers in their entirety, adding nothing new nor transformative to the trailers. Rather than splicing and selecting scenes from the defendant's motion pictures, it instead has copied defendant's entire trailer.

Because plaintiff's clip previews and copies of defendant's trailers consist entirely of scenes from the copyrighted work, plaintiff relies entirely on the expressive value of defendant's works. Accordingly, this factor weighs against the finding of a fair use defense.

d. *Effect of the Use Upon the Potential Market for or Value of the Copyrighted Work*

■ The fourth factor, that of the effect of the use upon the potential market for or value of the copyrighted work, "is undoubtedly the single most important factor of fair use." *Harper & Row,* 471 U.S. at 566, 105 S.Ct. 2218 (citing 3 Nimmer § 13, 05[A], at 13–76, and cases cited therein). "If the intended use is for commercial gain, that likelihood [of market harm] may be presumed. But if it is for a noncommercial purpose, the likelihood must be demonstrated." *A & M Records v. Napster,* 239 F.3d 1004, 1016 (9th Cir. 2001) (quoting *Sony Corp.,* 464 U.S. at 451, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984)).

Plaintiff argues that its database previews for home video retailers and the public is not a market that Disney will enter because it will not be involved in promoting its competitors' videos. In addition, plaintiff contends, without citation to record support, that its use of the previews has not reduced sales or rentals of Disney's home videos or movies in any way, and therefore its use benefits the public and the value of the videos.

The evidence indicates, however, that Disney and BVHE, as well as those it has licensed to use its trailers on the internet, including Apple Computer, are forced to directly compete with plaintiff as sources of Disney trailers on the internet. *See* McQueen Cert., Defs.' App. Ex. D, ¶ 14; Kolo Dep. Tr., Defs.' App. Ex. J, at 169. According to the certification of BVHE's VP of Legal and Business Affairs Kristin McQueen, BVHE, Miramax, and their affiliates and licensors have made and continue to make large expenditures to direct internet traffic to these sites. McQueen Cert., Defs.' App. Ex. D, ¶ 14. In addition, plaintiff obtains payment for its streaming services on a per-megabyte basis in most

cases, ranging from 2 cents to 12 cents per megabyte.

Moreover, as defendant correctly points out, the trailers and clip previews have been used to enhance and advertise plaintiff's services and to increase traffic and "stickiness" of web sites. *See, e.g.,* Kolo Dep. Tr., Defs.' App. Ex. J, at 150–59, 182; Darner Email, Defs.' App. Ex. L. In addition, plaintiff's advertisements for insertions in its previews or trailers make the point that revenue can be generated through these third party advertising spots at the beginning and end of the trailers. *See* Advertisement, Defs.' App. Ex. AA. These uses, as defendant maintains, are precisely those which it, as copyright holder, maintains through its trailers.

Plaintiff contends that this impact on defendant's retail business is irrelevant because, it asserts, § 106 does not provide a copyright holder with a second monopoly over retail sales. Contrary to plaintiff's assertion, and consistent with federal law regarding this fourth element of the fair use defense, the impact on defendant's potential market *is* relevant to the fair use analysis. Again, plaintiff merely reargues its unsupported position that any use resulting in the free flow of information and exchange of ideas constitutes fair use. Moreover, plaintiff's use of the word "monopoly" does not establish its existence, nor does it alter the above analysis.

Furthermore, even if defendant were not already in the same market of providing previews or trailers online, Judge Posner in *Ty* does not discount the possibility in this analysis that the copyright holder may one day decide to enter into the markets established for derivative works of the copyrighted materials:

[R]emember that photographs of Beanie Babies are conceded to be derivative works, for which there may be a separate demand that Ty may one day seek

to exploit, and so someone who without a license from Ty sold photographs of Beanie Babies would be an infringer of Ty's sculpture copyrights.

*Ty*, 292 F.3d at 519.

Because plaintiff's use is for its own commercial gain, and due to the evidence indicating that plaintiff's actions detract from defendant's potential market, this factor weighs against a finding of fair use.

### e. *Conclusion*

 After considering the above factors, this Court finds as a matter of law that plaintiff is not entitled to the fair use defense with respect to defendant's copyright claims. Summary judgment with respect to plaintiff's claim for declaratory judgment will be denied.

### D. *Finding of Copyright Infringement*

 In conclusion, defendant has established that plaintiff's digitization and internet streaming of the in-store trailers, the clip previews and copying of Disney trailers occurring post-December 2000 constitute copyright infringement. As discussed above, plaintiff cannot avail itself of the asserted defenses of estoppel, lack of registration, copyright misuse, implied license, derivative work and fair use, all of which fail as a matter of law. Accordingly, defendant is entitled to summary judgment in its favor on its copyright claims with respect to post-December 2000 conduct. Judgment will herein be entered.

### E. *Breach of Contract Counterclaim*

Plaintiff alleges that it is entitled to summary judgment on BVHE's breach of contract claim because BVHE has not ex-perienced any legally cognizable damages relating to plaintiff's alleged breach of the 1988 Master Clip License Agreement, and because BVHE failed to perform its own contractual duty of designating the videos and use of the preview tapes, as stated in the Agreement. To prevail on its breach of contract claim, defendant must prove the following elements: (1) a valid contract existed between plaintiff and defendant; (2) plaintiff breached the contract; (3) defendant performed its obligations under the contract; and (4) defendant was damaged as a result of the breach.[13] *See, e.g., Nat'l Util. Serv., Inc. v. Chesapeake Corp.,* 45 F.Supp.2d 438, 448 (D.N.J.1999); *see also Coyle v. Englander's,* 199 N.J.Super. 212, 223, 488 A.2d 1083 (App.Div.1985).

 Under New Jersey law, once a plaintiff has established an injury, it need prove the amount of damages only to a reasonable degree of certainty. *Lithuanian Commerce Corp. v. Sara Lee Hosiery,* 219 F.Supp.2d 600, 605 (D.N.J.2002) (citing *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1176 (3d Cir.1993)) (citing *Tessmar v. Grosner,* 23 N.J. 193, 203, 128 A.2d 467 (1957)). New Jersey courts have consistently held that " '[t]he rule relating to uncertainty of damages applies to the uncertainty as to the fact of damage and not as to its amount, mere uncertainty as to the amount will not preclude the right of recovery.' " *Lithuanian Commerce,* 219 F.Supp.2d at 605 (quoting *Tessmar,* 23 N.J. at 203, 128 A.2d 467); *see also Kozlowski v. Kozlowski,* 80 N.J. 378, 388, 403 A.2d 902 (1979) ("While the damages flowing from defendant's breach of contract are not ascertainable with exactitude, such is not a bar to relief.").

---

**13.** Plaintiff relies upon New Jersey law as the law governing the contract dispute. While Disney does not agree that New Jersey law applies, it relies on such law for purposes of this motion "to avoid the creation of an issue that is entirely irrelevant to the denial of Video Pipeline's summary judgment motion." Def.'s Opp. Br. at 23 n. 3. Defendant, however, also moves for summary judgment on its breach of contract counterclaim, and relies on New Jersey law for support of such claim.

■ In this case, plaintiff does not dispute that defendant has established the first two elements. The record demonstrates that plaintiff and defendant entered into a Master Clip License Agreement on November 7, 1988, and that BVHE provided trailers to plaintiff from time to time pursuant to the terms of the Agreement until its termination on November 29, 2000. *See* McQueen Cert., Defs.' App. Ex. D, ¶ 4; Horovitz Aff., Defs.' App. Ex. E, ¶ 29. In addition, the record demonstrates that defendant had terminated the agreement on November 29, 2000, due to plaintiff's use of the in-store trailers for streaming on the internet, contrary to any terms in the Master Clip License Agreement, or in any of the designation letters sent by defendant to plaintiff. Horovitz Aff., Defs.' App. Ex. E, ¶¶ 27–28.

Plaintiff disputes the existence of the third element, that defendant performed its obligations under the Master Clip License Agreement on the ground that defendant, after February 9, 1993, did not designate limitations on the use of some trailers contrary to the express wording of the Agreement. The Master Clip License Agreement provided:

> This letter constitutes an agreement between Buena Vista Home Video ("Disney") and Video Pipeline, Inc. ("Licensee") in connection with *Disney's grant to Licensee of permission to use certain three-quarter inch (3/4) broadcast quality videotape masters of certain clips as shall be designated by Disney from time to time* (the "Videos") in connection with the preview tapes *to be created for such uses as Disney shall designate from time to time* (the "Programs"), upon the terms and conditions set forth herein:

Master Clip License Agreement, Pl.'s App. Ex. I (emphasis added). Plaintiff in its argument refers to defendant's practice of sending designation letters to plaintiff,

specifying the limitations of the trailers' use, during the period of time from 1988 to February 9, 1993. As noted above, that practice stopped in 1993 due to a paperwork backlog regarding the trailers. When the terms of a contract are clear, the court must enforce the terms as written. *Karl's Sales & Serv., Inc. v. Gimbel Bros., Inc.,* 249 N.J.Super. 487, 592 A.2d 647, 650 (1991). Here, the Agreement plainly states that the designations for the use of Disney's videotape masters shall occur "from time to time," though plaintiff attempts to impute more into the clause. Construed as written, the Agreement did not require that defendant send a designation letter with every trailer it sent to plaintiff. The Agreement also is entirely void of condition language, such as "subject to," "on the condition that," or "not until such time as." The language in the Agreement regarding designations does not serve as a condition precedent, as maintained by plaintiff. Here, where neither party had terminated the Master Clip License Agreement, and where defendant provided the trailers when requested by plaintiff, with no evidence to the contrary, defendant has substantially complied with the terms of the Agreement.

Furthermore, certain of plaintiff's written requests for defendant's trailers post-February 1993 specifically requested their use for in-store compilations for Top Thirty, Audio Pipeline & Top Ten, Blockbuster, Borders, Movie Time, Musicland, Pathmark, Rogers Video, Suncoast, Super Club, Visual Expressions, West Coast, and The Wherehouse. Green Letter, 3/23/94, Defs.' App. Ex. K, Tab 52. Defendant responded to the request by sending the trailers, with no need for further confirmation.

■ Plaintiff also disputes the existence of the fourth element, arguing that Disney has not proffered any evidence of

harm as required by Rule 56, Fed.R.Civ.P. The deposition testimony of Kristin McQueen, Vice President for Business and Legal Affairs of BVHE, indicates that defendant was not damaged in certain respects by plaintiff's alleged breaches. *See* McQueen Dep. Tr. 2/7/02, Pl.'s Sum. J. Br.App. Ex. L, at 48. McQueen stated in her deposition the following:

Q: And I'm assuming, because no complaints were ever made, no legal claims have ever been filed against Buena Vista regarding any use by Video Pipeline of Buena Vista trailers?

A: Correct.

Q: Has anyone ever communicated to Buena Vista Home Entertainment that they were confused in any manner as a result of Video Pipeline's use of Buena Vista Home Entertainment's trailers?

A: Not to my knowledge.

Q: Has anyone ever communicated in any way to Buena Vista Home Entertainment that they were confused due to Video Pipeline's use of clip previews on the internet? And by "clip previews," I mean those previews that Video Pipeline created from home video footage.

A: Not to my knowledge.

Q: Do you know of any facts demonstrating the existence of any confusion by anyone due to Video Pipeline's use of Buena Vista's trailers?

A: No.

Q: Do you know of any facts demonstrating the existence of any actual confusion by anyone due to Video Pipeline's use of the clip previews?

A: No.

McQueen Dep. Tr. 2/7/02, Pl.'s Sum. J. Br.App. Ex. L, at 48. This deposition testimony of BVHE's Vice President for Business and Legal Affairs provides that no one has ever filed a claim against Disney regarding plaintiff's use of the authorized trailers. In addition, even though defendant alleges it has been harmed because plaintiff agreed to not make it appear that Disney is the sponsor of the product, no consumers or retailers ever informed Disney that they were confused by plaintiff's use of the clip previews.[14]

As defendant points out, however, a plaintiff who proves a breach of contract but no actual damages may not recover more than nominal damages. *See Thomas F. Ruane Dev. Corp. v. Cullere,* 134 N.J.Super. 245, 252, 339 A.2d 229 (App. Div.1975) (citing *Ench v. Bluestein,* 52 N.J.Super. 169, 173–74, 145 A.2d 44 (App. Div.1958)), *overruled on other grounds, Kutzin v. Pirnie,* 124 N.J. 500, 591 A.2d 932 (1991) (overruling common law rule that where vendee of real property makes part payment on purchase price, but fails to fulfill contract without lawful excuse, he cannot recover the payment). Here, defendant contends that it has suffered the loss of the value of the videotape masters for the in-store trailers, the ability to ensure that its talent and creative partners that their images, music and other work will be used only in accordance with contractual authorizations provided to Disney. In addition, defendant asserts that plaintiff's breaches have caused defendant to expend significant funds to monitor plaintiff's unauthorized use of those videotape masters and BVHE's trademarks on the Internet and elsewhere.

Here, given the express language of the Agreement, the parties' course of dealings, plaintiff's argument regarding a condition precedent is unavailing. Defendant sufficiently demonstrates that it entered into an agreement with plaintiff, that defendant

---

14. Judge Kugler's Order of February 2, 2002, also had stated that "Defendant in effect concedes for purposes of this lawsuit it cannot demonstrate any lost sales or profits." J. Kugler Order, 2/4/02.

has satisfied its obligations under the contract, and that plaintiff breached the agreement. Defendant's motion for summary judgment with respect to its breach of contract claim will be granted, and plaintiff's motion for summary judgment on this claim will be denied. Without evidence of actual damages, however, defendant can recover no more than nominal damages on this counterclaim. The Court finds, therefore, as a matter of law, that defendant's recovery upon its breach of contract counterclaim shall be limited to nominal damages in the amount of one dollar. Therefore, upon BVHE's counterclaim for breach of contract, a judgment in favor of BVHE in the amount of one dollar will be entered.

### F. Trademark Claims

■ Plaintiff alleges that Disney's trademark counterclaim fails because there is no evidence of any actual consumer confusion, which it claims is necessary to recover money damages under Section 43 of the Lanham Act, 15 U.S.C. § 1125(a). Defendant's counterclaim includes federal unfair competition and false designation of origin under the Lanham Act, 15 U.S.C. § 1125(a), which requires that defendant show that (1) the mark is valid and legally protectable; (2) the mark is owned by defendant; and (3) the plaintiff's use of the mark to identify goods or services is likely to create confusion concerning their origin. *See Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.,* 104 F.Supp.2d 427, 456 & n. 10 (D.N.J.2000) (citing *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 473 (3d Cir.1994) (noting that this standard applies to claims under both § 1114 and § 1125)), *aff'd,* 269 F.3d 270 (3d Cir.2001). These elements are also required for defendant's state unfair competition claim under N.J.S.A. 56:4–1. *See American Tel. & Tel. Co. v. Winback & Conserve Program, Inc.,* 42 F.3d 1421, 1433 (3d Cir.1994) (" '[F]ederal law of un-

fair competition under § 43(a) is not significantly different from the New Jersey [common] law of unfair competition' and have applied the identical test to both claims.") (quoting *American Greetings Corp. v. Dan–Dee Imports, Inc.,* 807 F.2d 1136, 1141 (3d Cir.1986); *American Home Prods. Corp. v. Barr Labs., Inc.,* 656 F.Supp. 1058, 1061 (D.N.J.1987), *aff'd* 834 F.2d 368 (3d Cir.1987)).

■ No genuine issue of material fact exists with respect to the first two elements. These first two elements are proved when a mark is federally registered and has become "incontestible" under the Lanham Act, 15 U.S.C. §§ 1058 and 1065. *Advance Magazine Publishers, Inc. v. Vogue Int'l,* 123 F.Supp.2d 790, 795 (D.N.J.2000) (citing *Fisons Horticulture,* 30 F.3d at 472). Here, the trademarks are each the subject of a federal trademark registration that has become "incontestible" (except "Miramax") under the Lanham Act, 15 U.S.C. § 1058 and 1065, as follows:

| Mark | Registration Date | Registration No. |
| --- | --- | --- |
| Walt Disney | 2/14/84 | 1267000 |
| Buena Vista | 12/12/89 | 1570700 |
| Hollywood Pictures | 5/21/91 | 1724331/1652072 |
| Touchstone | 4/25/89 | 1536119 |
| Miramax | 3/14/95 | 2423329 |

Def.'s App. Ex. A.

Defendant argues that summary judgment on its state unfair competition, and unfair competition and false designation of origin claim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), should be granted in its favor because plaintiff's use of the marks is likely to cause confusion under the third element of likelihood of confusion as to the origin of, or sponsorship, endorsement, and approval of the clip previews, relying on *Playboy Enters., Inc. v. Frena,* 839 F.Supp. 1552 (M.D.Fla.1993), *superseded by statute on other grounds, ALS Scan, Inc. v. RemarQ Cmtys., Inc.,* 239 F.3d 619, 623 (4th Cir.2001). In *Play-*

boy Enterprises, defendant operated a computer bulletin board service, which distributed unauthorized copies of plaintiff's copyrighted photographs, identified by registered trademarks. The district court, after evaluating seven factors regarding likelihood of confusion, found that defendant's display of the mark on the internet constituted trademark infringement of the federally registered trademarks, and granted plaintiff's summary judgment motion.

In the Third Circuit, to establish likelihood of confusion, a plaintiff must prove that " 'consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark.' " *Checkpoint Sys.*, 104 F.Supp.2d at 456 (examining likelihood of confusion under unfair competition under 15 U.S.C. § 1125(a) and trademark infringement under § 1114) (quoting *Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 (3d Cir. 1991) (internal quotation omitted)). The applicable standard is not possibility of confusion, but likelihood of confusion. *Checkpoint Sys.*, 104 F.Supp.2d at 456 (citing *Genovese Drug Stores, Inc. v. TGC Stores, Inc.*, 939 F.Supp. 340, 345 (D.N.J. 1996)). Defendant's required showing of proof on the likelihood of confusion issue depends on whether the trademark owner and alleged infringer deal in directly competing products. *See Checkpoint Sys.*, 104 F.Supp.2d at 456. Here, plaintiff's clip previews may compete with defendant's trailers, but they do not compete with defendant's other products, such as the motion pictures which also use the trademark. To the extent that they do not compete with each other, the Third Circuit has adopted a ten-factor test to determine the likelihood of confusion in the marketplace as to a product's source:

(1) the degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of customers when making a purchase;

(4) the length of time the alleged infringer has used the mark without evidence of actual confusion;

(5) the intent of the alleged infringer in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function; and

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

*Checkpoint Sys.*, 104 F.Supp.2d at 457 (citing *Fisons*, 30 F.3d at 473; *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d at 1231). None of these factors is determinative, and each must be weighed and balanced against the other. *Checkpoint Sys.*, 104 F.Supp.2d at 457 (citing 3 McCarthy on Trademarks and Unfair Competition, § 24:30 (4th ed.1996)). Defendant moves for summary judgment on the basis that plaintiff's use of Disney's marks is likely to cause viewers to believe that Disney is the source of Video Pipeline's allegedly amateurish trailers, or that Disney sponsored, endorsed, or approved plaintiff's clip previews. Plaintiff opposes defendant's summary judgment motion

solely on the ground that no actual confusion existed in this case.[15]

"Similarity of the marks is merely one of the relevant factors, and it is not dispositive on the issue of likelihood of confusion." *Checkpoint Sys.*, 104 F.Supp.2d at 457 (quoting *Harlem Wizards Entm't Basketball, Inc. v. NBA Props., Inc.*, 952 F.Supp. 1084, 1096 (D.N.J.1997)). Under the first factor, defendant argues that plaintiff's use of Disney's marks in connection with the clip previews is likely to cause viewers to believe that Disney is the source of the allegedly amateurish trailers, or that Disney sponsored, endorsed, or approved plaintiff's clip previews. Here, plaintiff does not dispute that the marks it displays at the beginning of its clip previews are identical images of the trademarks registered by Disney. In this case, plaintiff made no changes or modifications to the trademark itself before displaying the trademark in their clip previews. Thus, the first factor weighs in favor of finding trademark infringement.

Under the second factor, " '[t]he Lanham Act's tolerance for similarity between competing marks varies inversely with the fame of the prior mark. As a mark's fame increases, the Act's tolerance for similarities in competing marks fails.' " *Checkpoint Sys.*, 104 F.Supp.2d at 457 (quoting 2 J.T. McCarthy, McCarthy on Trademarks and Unfair Competition § 11:73 (4th ed.1996) (internal quotation omitted)). Trademark strength is a function of a mark's distinctiveness and commercial presence that is developed through use and promotion. *See ChiChi's, Inc. v. Chi–Mex., Inc.*, 568 F.Supp. 731, 735–36 (W.D.Pa.1983). Here, Disney has used the names listed above and the accompanying trademarks in connection with its motion picture business, continuously for several years. It is undisputed that defendant and its trademark names have reached a status within the movie industry that is rivaled by few others. This long use of well–known marks renders the trademark very strong within the field of motion pictures.

Under the third factor, the price of the goods and other factors indicative of the care and attention of the customer when making a purchase, the relatively low price of the video sales and rentals falls in plaintiff's favor. "As common sense dictates, the law provides that confusion is unlikely if the products or services at issue are complex and expensive, the purchasers highly sophisticated, and the purchase process one that is lengthy and requires close attention and analysis by the purchasers." *Checkpoint Sys.*, 104 F.Supp.2d at 460 (citations omitted); *see also Advance Magazine Publ'ns*, 123 F.Supp.2d at 797 ("The potential pool of consumers who may be confused by defendants' use of the names in question is vast; it includes purchasers ... of fashion items via the Internet, and fashion magazine consumers and readers."). The low rental prices, upwards of $5.00 per video, and sales prices, which may reach approximately $30 or more, indicate that customers may not display exacting detail when viewing the clip previews of the plaintiff or the trailers of the defendant. The fact that the viewing of the clip previews and trailers, as well as the ultimate purchases and rentals of defendant's products, takes place over the internet, rather than in a brick-and-mortar store, also means that careful decision-making is less prevalent. Furthermore, the viewing of the clip previews by the general public, taking up to approximately 2 minutes of the viewer's time, supports

---

**15.** Neither of the parties provided complete briefing of the other factors in the likelihood of confusion analysis.

this conclusion. This factor falls in favor of finding likelihood of confusion.

Under the fourth factor, the length of time the plaintiff has used the mark without actual confusion, and the sixth factor, evidence of actual confusion, the evidence demonstrates that defendant has, at no time, received a complaint regarding plaintiff's use of the mark, nor has defendant supplied any documentation of any consumer's actual confusion regarding plaintiff's clip previews and defendant's work. There has thus been no period of time during which plaintiff used the mark with consumers being actually confused. Indeed, the deposition testimony of McQueen, discussed above, supports this contention that no reports of actual confusion were made.

Although plaintiff asserts that summary judgment should be denied based on the single factor of actual confusion, it must be noted, however, that "[e]vidence of actual confusion between the parties is a significant, but not determinative or necessary, factor bearing on the likelihood of confusion." *Checkpoint Sys.*, 104 F.Supp.2d at 460–61 (citing *Versa Prods. Co. v. Bifold Co.*, 50 F.3d 189, 205 (3d Cir.), *cert. denied*, 516 U.S. 808, 116 S.Ct. 54, 133 L.Ed.2d 19 (1995); *Fisons*, 30 F.3d at 476; *First Keystone Fed. Sav. Bank v. First Keystone Mortgage, Inc.*, 896 F.Supp. 456, 462 (E.D.Pa.1995)). The law recognizes that random instances of confusion often go unreported or unrecorded. *See Playboy Enter., Inc. v. Universal Tel–A–Talk, Inc.*, No. 96–6961, 1998 WL 767440, at *6 (E.D.Pa. Nov.3, 1998). The fact that there is no reported instance of actual confusion is not dispositive, and the fact that there is actual confusion does not prove likelihood of confusion, though it is highly probative of such a finding, *see Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 n. 5 (6th Cir.1982). Thus, here, where there is no evidence of actual confusion, nor evidence of any period of time in which plaintiff's clip previews were used while consumers were actually confused, these fourth and sixth factors weigh against a finding of likelihood of confusion.

Under the fifth factor, the intent of the plaintiff in adopting the mark, the presence of predatory intent weighs strongly in favor of a finding of likelihood of confusion. *See Checkpoint Sys.*, 104 F.Supp.2d at 465 (citing *Nat'l Football League Props. v. New Jersey Giants, Inc.*, 637 F.Supp. 507, 518 (D.N.J.1986)). It is undisputed that plaintiff intended to use defendant's trademarks in its clip previews as part of its marketing for defendant's products. An email from Mr. Horovitz indicated the company's intent:

> We will immediately begin creating previews in house from "fair use" samples of the programs. When the Disney/Paramount sales and marketing people realize they are not getting the same timely and persuasively edited promotion as the other studios, they will start sending us material for net promotion again.

Horovitz Email, 10/16/00, Pl.'s App. Ex. B, Tab H. Indeed, plaintiff's clip previews were created to provide trailers to the internet customers of retailers and distributors who sold and rented out Disney's movies, for the express goal of receiving Disney's permission to use its trailers online. This factor of plaintiff's intent weighs in favor of likelihood of confusion.

The remaining factors, including whether the goods are marketed through the same channels of trade and advertised through the same media, whether they have the same target sales efforts, the relationship of the goods in the minds of potential customers, and other factors indicating that consumers expect defendant to enter plaintiff's field or expand into its market, are important in showing whether likelihood of confusion exists within the

context of the marketplace, *see Checkpoint Sys.*, 104 F.Supp.2d at 466 (citing *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1569 (Fed.Cir.1983)). It is undisputed that the targets of the parties' sales efforts are identical, that is, that both parties' efforts are to further the sales or rentals of defendant's copyrighted movies. Plaintiff creates and streams its clip previews directly for the benefit of the retailers and distributors, and indirectly for the benefit of defendant. It is undisputed that plaintiff's clip previews are viewed on the internet, and therefore in the same media as the ultimate purchase or rental of defendant's motion picture videos. Accordingly, the goods are marketed through the same channel of trade. In addition, consumers viewing plaintiff's clip previews, while shopping through the retailers' web sites for video sales, may easily believe that the clip previews which use the trademarks are authorized by Disney, the trademark holder. The goods are thus synonymous in the minds of the consumers because of the similarity of the clip previews and the movies they advertise. In addition, defendant does create its own trailers to promote its movies, and allows the retailers and distributors with licensing agreements to use these authorized trailers in promotion of the motion pictures. Thus, defendant's products do compete with plaintiff's products.

In this context of the marketplace, plaintiff's clip previews appear in the same channels of trade as defendant's motion picture videos, necessarily so because the promoted goal is the ultimate purchase or rental of the videos. The targeted customers would therefore be identical. Furthermore, defendant already creates its own trailers using the trademarks and thus competes with plaintiff's clip previews in the internet marketplace.

Accordingly, the Court finds that the parties do market their products in the same channels of trade; that the targeted goal is identical, thereby drawing identical customers; that defendant, by virtue of creating its own trailers, does compete with plaintiff; and that the relationship of the goods is so connected that consumers would assume that the products emanated from the same company. These factors, separately and considered together, weigh in favor of finding likelihood of confusion.

In conclusion, examination of the above factors, only two of which weigh against defendant, weighs in favor of finding likelihood of confusion. Viewing the evidence in the light most favorable to plaintiff, there is no genuine issue of material fact that there is a likelihood of confusion arising from consumers viewing of the marks in plaintiff's clip previews, which creates an assumption that the product it represents is associated with defendant, the source of different products and services identified by the same mark. The fact that there is no actual consumer confusion about the origin of plaintiff's trailers reported to defendant in this case is not dispositive and is only one factor among many to be weighed. Every other indicia of likelihood of consumer confusion regarding the origin of plaintiff's clip previews is present to a compelling degree. Defendant's motion for summary judgment on its unfair competition and false designation of origin claims under the Lanham Act, and its unfair competition under state law, will therefore be granted.

Plaintiff's argument that likelihood of confusion is generally a fact question appropriate for a jury, relying on *Country Floors, Inc. v. P'ship of Gepner & Ford*, 930 F.2d 1056 (3d Cir.1991), does not alter this conclusion. *Country Floors* involved two similarly designed marks, which used the same type font and were both set on ceramic tile. Although the district court granted summary judgment on manufac-

turer's trademark infringement and unfair competition claims to the competitor, the Third Circuit determined that a genuine issue of material fact existed as to whether the products of the manufacturer and competitors had significant likelihood of confusion. That case is distinguishable from the instant case if only for the reason that plaintiff's marks in this case are *identical* to those of defendant, and there is no dispute that plaintiff appropriated defendant's registered trademarks for its own use. Furthermore, although plaintiff relies on the fact that no actual confusion has been shown, plaintiff points to no other fact that weighs against a likelihood of confusion, and all other factors in the analysis weigh significantly in favor of such a finding.

Although plaintiff asserts that summary judgment may be granted only where no reasonable juror could find that a likelihood of confusion existed, relying on *800 Spirits, Inc. v. Liquor by Wire, Inc.*, 14 F.Supp.2d 675 (D.N.J.1998), that case is inapposite. In that case, the district court granted summary judgment to the alleged infringer, after concluding that the mark, which had not achieved incontestability, was not valid and legally protectable because the mark was generic. Here, no reasonable juror could conclude anything other than that a likelihood of confusion as to the source of the goods or services exists due to plaintiff's use of defendant's trademark. Because a reasonable juror could only conclude that a likelihood of confusion existed, defendant's motion for summary judgment on its claims for state unfair competition and for unfair competition and false designation of origin under the Lanham Act will be granted.

### 1. *Damages Under § 1125(a)*

 Plaintiff additionally moves for summary judgment on defendant's claims under § 1125(a), asserting that actual confusion is necessary to recover money dam-

ages. Section 1125(a) provides, in relevant part:

> Any person who, or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). Furthermore, a prevailing party under this statute may recover under section 35(a) of the Lanham Act, as follows, in relevant part:

> When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 1125(a) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) *defendant's profits,* (2) *any damages sustained by the plaintiff,* and (3) *the costs of the action.* The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.

15 U.S.C. § 1117 (emphasis added); *see also Resorts Int'l, Inc. v. Greate Bay Hotel*

& Casino, Inc., 830 F.Supp. 826, 839 (D.N.J.1992) (citing 15 U.S.C. § 1117).

As stated by the late Chief Judge Gerry in Resorts International, the test for the right to recover compensatory damages under section 35(a)(2) "is whether plaintiff has shown an actual diversion of consumers." Resorts Int'l, 830 F.Supp. at 838. On the other hand, "no showing of actual confusion or diversion of customers, or of actual loss, is necessary to obtain an accounting for profits under section 35(a)(1)." Id. at 839 (citations omitted). This is because, the court explained, "the remedy of profits flows 'not from the plaintiff's proof of its injury or damage, but from its proof of the defendant's unjust enrichment or the need for deterrence. . . .' " Id. (quoting Web Printing Controls Co. v. Oxy–Dry Corp., 906 F.2d 1202, 1205 (7th Cir.1990)).

The court thus distinguished the above standards for recovery of damages, from the factor of "actual confusion," which is considered in determining liability. Resorts Int'l, 830 F.Supp. at 838 ("Scott Paper, in establishing actual confusion as a factor in finding likelihood of confusion, was concerned with liability under section 43(a), and not right to recover damages under section 35(a)(2)."); see also Choice Hotels Int'l, Inc. v. Pennave Assocs., Inc., 43 Fed. Appx. 517, 518–19, 2002 WL 1986509, *1 (3d Cir. Aug.28, 2002) ("proof of loss . . . is a damages issue, and . . . proof of confusion . . . is a liability issue"). Moreover, while plaintiff contends that actual consumer confusion is necessary to recover money damages under 15 U.S.C. § 1125(a), the language of the statute itself requires only that use of the mark be "likely to cause confusion," not that actual confusion be proved. Choice Hotels Int'l, 43 Fed.Appx. 517, 518–19 ("[T]he text of the statute itself[ ] . . . does not require th[at] actual confusion be proved for an award of damages. Use of a mark which is 'likely to cause confusion' is all that is required by 15 U.S.C. § 1125(a)(1)(A).").

But see Int'l Election Sys. Corp. v. Shoup, 452 F.Supp. 684, 712 (E.D.Pa.1978) ("In order to collect damages for a violation of the statute [§ 1125(a) ], the plaintiff must show that actual confusion as to the source of origin of the product has occurred.") (citation omitted), aff'd, 595 F.2d 1212 (3d Cir.1979) (table). Furthermore, plaintiff cites to Res. Devs., Inc. v. Statue of Liberty–Ellis Island Found., Inc., 926 F.2d 134, 139 (2d Cir.1991), a case that has been neither cited nor relied upon by the Third Circuit or a court in this jurisdiction for the proposition that actual consumer confusion is required for damages to be awarded under § 1125(a).

Because actual confusion is not required for damages to be awarded under § 1125(a), plaintiff's motion for summary judgment with respect to defendant's trademark claims will be denied.

### 2. State Unfair Competition Claim

█ Plaintiff claims that Disney's unfair competition claim under N.J.S.A. 56:4–1 fails because Disney has not experienced any legally cognizable damages. N.J.S.A. 56:4–1 provides that "[n]o merchant, firm or corporation shall appropriate for his or their own use a name, brand, trade-mark, reputation or goodwill of any maker in whose product such merchant, firm or corporation deals." N.J.S.A. 56:4–1. Plaintiff argues that it does not compete with Disney, that it is in the business of compiling promotional video clips, for the benefit of video retailers and consumers in promoting home video sales and rentals.

Plaintiff cites to no authority for the proposition that legally cognizable damages must be shown for defendant to prevail on its state unfair competition claim. However, as discussed above, for both the federal and state unfair competition claims, defendant has established that (1) the mark is valid and legally protectable;

(2) the mark is owned by defendant; and (3) the plaintiff's use of the mark to identify goods or services is likely to create confusion concerning their origin. Plaintiff's motion for summary judgment will be denied.

### G. *State Claims for Conversion and Replevin*

 Defendant moves for summary judgment as to its claims for conversion and replevin with respect to the in-store trailers it provided to plaintiff from 1993 to 2000. A claim for conversion is established if a party proves that the alleged offender assumed and exercised the right of ownership over the party's goods or personal chattels without permission, and excluded the owner from exercising dominion over them. *See Barco Auto Leasing Corp. v. Holt,* 228 N.J.Super. 77, 83, 548 A.2d 1161 (App.Div.1988). Under N.J.S.A. 2B:50–1, "[a] person seeking recovery of goods wrongly held by another may bring an action for replevin ... If the person establishes the cause of action, the court shall enter an order granting possession." N.J.S.A. 2B:50–1. Plaintiff opposes the motion only on the ground that the trailers Disney gave to plaintiff from 1993 to 2000 were allegedly not subject to the 1988 Agreement's terms and conditions.

In this case, plaintiff does not dispute that it continues to hold physical possession of the in-store trailers furnished to it by defendant from February 9, 1993 to 2000. Plaintiff has assumed and exercised the right of ownership over the physical copies of the three-quarter inch broadcast quality in-store trailers, refusing defendant's requests to return a number of them. Mr. Horovitz's Affidavit provides that on December 21, 2000, plaintiff returned to defendant all in-store trailers "subject to the license agreement." Horovitz Aff, Pl.'s App. Ex. D, ¶ 29. Plaintiff accordingly returned approximately 104 videotape masters to defendant on or around December 21, 2000, giving a list of 126 videos, with 22 videotape masters labeled "Not Found." *See* Pl.'s App. Prelim. Inj. Ex. 12.

Plaintiff asserts that the trailers Disney gave to plaintiff after February 9, 1993 were not subject to the 1988 Agreement's terms and conditions. As discussed earlier, the Master Clip License Agreement was not terminated until November 2000, and thus it was still in effect from 1993 to 2000. Moreover, the terms of the Agreement did not require, as plaintiff asserts, that defendant provide a designation of the usage of every videotape it sent to plaintiff. The plain terms of the contract required only that defendant designate the usage of the trailers "from time to time." Plaintiff's argument that any trailers it received during that period of time was not subject to the 1988 Agreement is therefore without merit.

Because plaintiff assumed the rights of the videotape masters without defendant's permission after defendant demanded the return of the videotape masters, defendant's motion will be granted with respect to its conversion and replevin claim. Plaintiff will be ordered to return all in-store trailers it received from Disney during the period of 1993–2000 that it still possesses.[16] The accompanying Order will so provide.

### III. *CONCLUSION*

For the reasons discussed above, defendant's motion for partial summary judgment on its copyright claims with respect

---

**16.** Defendant asserts that plaintiff still possesses the videotape masters for 343 in-store trailers, which were provided to plaintiff under the terms of the Master Clip License Agreement from 1993 to 2000. Plaintiff will be required to return these, and any others it possesses, and to certify that it has done so, within twenty (20) days hereof.

to plaintiff's post-December 2000 conduct will be granted. In addition, defendant's motion for summary judgment on its claims under the Lanham Act, and state law claims for breach of contract, unfair competition, replevin, and conversion will also be granted. Plaintiff's motion for summary judgment as to its claims for declaratory judgment will be denied, and its motion for summary judgment of defendant's counterclaims will be denied. Plaintiff will be ordered to return all videotape masters it received from defendant from 1993 to 2000, and to certify that it has done so within twenty (20) days hereof. The accompanying Order will be entered.

### ORDER

THIS MATTER having come before the Court upon defendant Buena Vista Home Entertainment's motions for partial summary judgment as to its copyright counterclaims only as to post-December 2000 conduct by plaintiff, and for summary judgment as to its Lanham Act claims, and state law claims for breach of contract, unfair competition, conversion and replevin; and plaintiff's motions for summary judgment in its favor on its declaratory judgment action, and for summary judgment on defendant's counterclaims above; and the Court having considered the parties' submissions; and for the reasons stated in the Opinion of today's date; and for good cause shown;

IT IS on this 7th day of August, 2003, hereby

ORDERED that plaintiff's motions for summary judgment [Docket Item No. 72–1; 78–1] with respect to its declaratory judgment claims be, and hereby are, *DE-NIED,* and its motion with respect to defendant's counterclaims be, and hereby is, *DENIED;* and it is

FURTHER ORDERED that defendant/counterclaim plaintiff's motion for partial summary judgment of its copyright claims with respect to plaintiff's post-December 2000 conduct [Docket Item No. 80–1] be, and hereby is, *GRANTED;* and

IT IS FURTHER ORDERED that defendant/counterclaim plaintiff's motion for summary judgment of its Lanham Act claims and state law claims for breach of contract, unfair competition, replevin and conversion [Docket Item No. 79–1] be, and hereby is, *GRANTED,* and plaintiff is hereby ordered to return all trailers given to plaintiff by defendant during the period from 1993 to 2000 within twenty (20) days hereof and to certify that it has done so; and accordingly

IT IS FURTHER ORDERED that Judgment be entered in favor of defendant/counterclaim-plaintiff Buena Vista Home Entertainment and against plaintiff/counterclaim defendant Video Pipeline, Inc.: (1) that Video Pipeline, Inc. is liable for infringing BVHE's copyrights after December 2000 and that Video Pipeline's defenses of estoppel, lack of registration, copyright misuse, implied license, derivative work and fair use fail as a matter of law; and (2) that Video Pipeline, Inc. is liable for infringing BVHE's trademarks in violation of the Lanham Act, 15 U.S.C. § 1125(a) (unfair competition and false designation of origin); and (3) that Video Pipeline, Inc. is liable for unfair competition under New Jersey law; and (4) that Video Pipeline, Inc. is liable for conversion and for replevin under New Jersey law with respect to all in-store trailers it received from BVHE from 1993–2000; and (5) that Video Pipeline, Inc. is liable for breach of contract upon which BVHE shall hereby recover only nominal damages of one dollar ($1.00).